NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-15

LUCARELL, APPELLEE, *v.* NATIONWIDE MUTUAL INSURANCE COMPANY, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Lucarell v. Nationwide Mut. Ins. Co.,* Slip Opinion No. 2018-Ohio-15.]**

*Contracts—Breach of contract—Punitive damages—Implied duty of good faith and fair dealing—Release of liability—Prevention-of-performance doctrine—Fraud—Punitive damages are not recoverable in a breach-of-contract action—When a breach of contract involves conduct that also constitutes a tort, punitive damages may be awarded only for the tort, not for the breach, and any punitive damages awarded are subject to the statutory limitations on punitive damages imposed in R.C. 2315.21—A party to a contract does not breach the implied duty of good faith and fair dealing by seeking to enforce the agreement as written or by acting in accordance with its express terms, nor can there be a breach of the implied duty unless a specific obligation imposed by the contract is not met—An unconditional release of*

*liability becomes effective upon execution and delivery and bars any claims encompassed within it unless it was procured by fraud, duress, or other wrongful conduct—A party seeking to avoid a release of liability on the basis that it was procured under duress is required to prove duress by clear and convincing evidence—The prevention-of-performance doctrine, which states that a party who prevents another from performing a contractual obligation may not rely on that failure of performance to assert a claim for breach of contract, is not a defense to a release of liability and therefore cannot be asserted as a defense to a release—A fraud claim cannot be predicated on predictions or projections relating to future performance or on misrepresentations made to third parties.*

(No. 2016-0585—Submitted April 5, 2017—Decided January 4, 2018.)

APPEAL from the Court of Appeals for Mahoning County,

Nos. 13-MA-74 and 13-MA-133, 2015-Ohio-5286.

_____

**SYLLABUS OF THE COURT**

1.  Punitive damages are not recoverable in an action for breach of contract. (*Ketcham v. Miller,* 104 Ohio St. 372, 136 N.E. 145 (1922), paragraph two of the syllabus, approved and followed.)

2.  When a breach of contract involves conduct that also constitutes a tort, punitive damages may be awarded only for the tort, not for the breach, and any punitive damages awarded are subject to the statutory limitations on punitive damages imposed in R.C. 2315.21.

3.  A party to a contract does not breach the implied duty of good faith and fair dealing by seeking to enforce the agreement as written or by acting in accordance with its express terms, nor can there be a breach of the implied duty unless a specific obligation imposed by the contract is not met.

4.  An unconditional release of liability becomes effective upon execution and delivery and bars any claims encompassed within it, unless it was procured by fraud, duress, or other wrongful conduct.

5.  A party seeking to avoid a release of liability on the basis that it was procured under duress is required to prove duress by clear and convincing evidence.

6.  The prevention of performance doctrine—which states that a party who prevents another from performing a contractual obligation may not rely  on that failure of performance to assert a claim for breach of contract—is not a defense to a release of liability and therefore cannot be asserted as a defense to a release.

7.  A fraud claim cannot be predicated on predictions or projections relating to future performance or on misrepresentations made to third parties.

_____

**O'DONNELL, J.**

**{¶ 1}** Nationwide Mutual Insurance Company appeals from a judgment of the Seventh District Court of Appeals, which affirmed a jury verdict in favor of Christine Lucarell on her claims for breach of contract and invasion of privacy but reversed a directed verdict entered by the trial court in favor of Nationwide on her claim for fraud.

**{¶ 2}** Lucarell sued Nationwide for breach of contract, fraudulent misrepresentation, invasion of privacy, retaliation, and constructive discharge, asserting it had fraudulently and in bad faith induced her to open a new insurance agency when it intended to terminate her after she generated a profitable book of business.  The case proceeded to trial, and at the close of her case-in-chief, the court directed a verdict in favor of Nationwide on the fraud claim.  The jury returned verdicts in favor of Lucarell in excess of $42 million in compensatory and punitive damages, finding that Nationwide had breached its contracts with her, invaded her privacy, retaliated against her, and constructively discharged her.  The trial court,

applying statutory caps on damages, entered judgment against Nationwide for more than $14 million in compensatory and punitive damages. Both parties appealed.

{¶ 3} The appellate court affirmed the breach of contract judgment, affirmed the invasion of privacy judgment in part, reversed the retaliation and constructive discharge judgments, and reinstated and remanded the fraud claim for a new trial. It also held that punitive damages could be awarded for breach of contract if Lucarell proved her fraud claim and that the jury could have found that Nationwide prevented her from performing obligations of releases she signed, allowing her to avoid them. It rejected Nationwide's assignments of error challenging the sufficiency of the evidence supporting the jury's verdicts on the breach of contract claims and the trial court's instruction on the standard of proof for duress.

{¶ 4} Nationwide appealed to this court, asserting that Ohio law does not permit punitive damages to be awarded for any breach of contract, that App.R. 12 required the appellate court to review the assignment of error challenging the sufficiency of the evidence of breach of contract, that Lucarell had the burden to present clear and convincing evidence of duress to avoid the releases she signed, that the prevention of performance doctrine is not a defense to a release, and that she failed to prove her claim for fraud.

{¶ 5} Upon review, we reaffirm that in Ohio, punitive damages may not be awarded for a breach of contract. We also clarify that a party to a contract does not breach the implied duty of good faith and fair dealing by seeking to enforce the agreement as written or by acting in accordance with its express terms, nor can there be a breach of the implied duty unless a specific obligation imposed by the contract is not met.

{¶ 6} In addition, a release of liability is an absolute bar to a later action on any claim encompassed within it absent a showing of fraud, duress, or other wrongful conduct in procuring it, and a party claiming duress is required to prove

4

duress by clear and convincing evidence. We further recognize that the prevention of performance doctrine—which states that a party who prevents another from performing a contractual obligation may not rely on that failure of performance to assert a claim for breach of contract—is not a defense to a release of liability and therefore cannot be asserted as a defense to a release. Lastly, a claimant cannot rely on predictions or projections that relate to future performance or that are made to third parties to establish a fraud claim.

{¶ 7} After careful review, we have concluded that the court of appeals erred as a matter of law in holding that punitive damages are available for a breach of contract, in failing to review the sufficiency of the evidence of breach of contract and the jury instruction on duress, in considering the prevention of performance doctrine as a defense to a release of liability, and in reinstating the fraud claim.

{¶ 8} Accordingly, we reverse the judgment of the court of appeals and remand the matter to the appellate court for further proceedings consistent with this opinion.

**Facts and Procedural History**

{¶ 9} Nationwide designed an Agency Executive Program ("AE Program") to recruit new insurance agents by offering planning, training, and startup financing from Nationwide Federal Credit Union to build profitable, self-sustaining agencies over a three-year period. The new agents were independent contractors who agreed to exclusively sell and service Nationwide products.

{¶ 10} Nationwide determined that to be profitable, a new agency would need to generate $1.2 million in direct written premium from new and renewed policies each year. If the program agent reached that sales goal in three years, that agent became a career agent, and if additional production goals were met, Nationwide would forgive part or all of any loans made to start the agency.

{¶ 11} Nationwide brought the AE Program to Ohio in 2004 and recruited Lucarell the next year. Based on a pro forma and business plan presented

to her by Bill Helfer, a Nationwide sales manager, she anticipated revenues of $200,000 a year. Working with Nationwide, she developed her own business plan and pro forma, but she did not see the final version before authorizing Helfer to sign it on her behalf. Those documents represented that Lucarell had an active role in developing the business plan and pro forma, and Nationwide disclaimed any guarantee of success.

{¶ 12} In November 2005, Lucarell signed an Independent Contractor Agent's Agreement, which specified that she was not a Nationwide employee and was responsible for her agency's expenses. She also signed the AE Program Performance Agreement, which included the schedule for disbursement of her $290,000 loan from Nationwide Federal Credit Union, the terms to qualify for a waiver of repayment of that loan, and the minimum production requirements to complete the AE Program. The exhibit containing the minimum production requirements is not part of the record in this case, however, and according to Lucarell, it was never part of her contract.

{¶ 13} Lucarell used the loan to start her agency in January 2006, renting, renovating, and furnishing office space, hiring two employees, and throwing a grand-opening party. She initially exceeded her minimum production requirements and won awards for her performance but began to have difficulty writing new policies and maintaining her cash flow.

{¶ 14} Other agents in the AE Program were also not meeting the minimum production requirements and were undercapitalized, so Nationwide began to modify the terms of the program. It offered agents the choice to (1) remain in the program, (2) leave with loans forgiven and Nationwide's agreement to pay off agency obligations such as leases, or (3) participate in a modified version of the AE Program. Nationwide also provided funds for agents to consult with accountants to prepare revised business plans in order to determine whether continuing in the program made financial sense.

**{¶ 15}** On February 7, 2007, Lucarell met with her sales manager Helfer and signed a Memorandum of Understanding ("MOU"), in which Nationwide offered her $15,000 in cash to prepare a new business plan and promised to reimburse $35,000 in business expenses as consideration for her to "completely release and forever discharge any and all claims which Agent may have against Nationwide * * * whether known or unknown, which were or could have been asserted against Nationwide from the beginning of time until the date of this MOU." Lucarell testified that when she signed the MOU, she had "no choice. * * * They would have terminated me and my agency, and my loan would become due in full."

**{¶ 16}** Lucarell submitted a new business plan prepared by a local certified public accountant, but Nationwide rejected it. Another Nationwide agent agreed to assist her in drafting a new business plan, which was supposed to be mutually acceptable, but according to Lucarell, Nationwide dictated it to her.

**{¶ 17}** Lucarell fell below her yearly minimum production requirements in August 2007 and continued to fall short throughout 2008. Nonetheless, between February 2007 and September 2008, Nationwide provided Lucarell additional cash infusions totaling $214,922, which she did not have to repay. She was also hoping to receive the books of business of two agents, Michael Ivan and Dennis White, who were considering retirement.

**{¶ 18}** On September 19, 2008, Lucarell entered into a Modified AE Program Agreement with Nationwide. In that contract, she acknowledged that Nationwide had given her the opportunity to exit the AE Program with Nationwide paying off her loan. She also "represent[ed] and warrant[ed] to Nationwide that [she] has made the decision to continue in the AE Program while under no economic duress," and she agreed that she "has entered this Modification voluntarily and of [her] own accord, without reliance on any inducement, promise, or representations by any other party, except those which are expressly set forth in

this Modification." She acknowledged that she had approved her new business plan and that it was not dictated by Nationwide.

{¶ 19} The Modified AE Program Agreement extended the time to complete the AE Program by 36 months, but it increased the total amount of direct written premium required to complete it to $1,534,676. The agreement also provided that the minimum production requirements would be calculated as "the sum of all of Agent's direct written premiums * * * during the previous 12 month period and shall be calculated on a 12 month moving basis." In place of the loan, Nationwide agreed to provide cash infusions of up to $429,448 during the term of the Modified AE Program, paid in monthly disbursements if Lucarell achieved her minimum production requirement for that month. The contract also permitted her to request refinancing of her loan from Nationwide Bank (successor to Nationwide Federal Credit Union), and Nationwide promised to participate in the refinancing if Nationwide Bank denied her application.

{¶ 20} The Modified AE Program Agreement contained a release, which provided:

> In consideration of the foregoing, Agent hereby releases and discharges Nationwide, its employees, officers, directors, and representatives of any and all claims or causes of action Agent has in any way relating to the AE Program, the AE Agreement, and the IC Agreement from the beginning of time to the present, including but not limited to, any claims for fraud, negligence, breach of contract, and any statutory claims.

It also contained an integration clause stating that the Modified AE Program Agreement, the AE Program Performance Agreement it modified, and the Independent Contractor Agent's Agreement superseded all prior oral or written

understandings between Lucarell and Nationwide and provided that these contracts constituted the entire agreement between them.

{¶ 21} For the next five months, Lucarell met the modified minimum production requirements and received the cash infusions pursuant to the Modified AE Program Agreement but continued to have insufficient cash flow. After Nationwide Bank refused to refinance her loan, Lucarell did not request Nationwide's assistance in refinancing; she had also missed her first interest-only payment on the loan in December 2008. She stopped paying federal and state taxes, fired her only agent in January 2009, and stopped paying rent for the agency the next month.

{¶ 22} Lucarell failed to meet her minimum production requirements in March 2009, and Nationwide placed her on probation in April 2009. Her March 2009 production was within 95 percent of the minimum required, and she sought an exception to enable her to receive that month's disbursement. Nationwide discovered that she had defaulted on her loan and initially denied her request but reconsidered and sent her the March disbursement on May 20, 2009. But it also informed her that beginning in July 2009, it would withhold part of her commissions to repay the defaulted loan. Her production never recovered, and she resigned in July 2009.

*Trial Proceedings*

{¶ 23} Lucarell sued Nationwide for breach of the original AE Program Agreement, the Independent Contractor Agent's Agreement, and the MOU, for fraudulent misrepresentation, and for invasion of privacy. Nationwide counterclaimed for the balance due on her loan. She amended her complaint and added claims that Nationwide retaliated against her by filing a counterclaim, constructively discharged her, and breached the Modified AE Program Agreement.

{¶ 24} At trial, she claimed she had been on track to complete the original AE Program, but Nationwide fraudulently induced her to sign the Modified AE

Program Agreement by misrepresenting her production data and by promising mergers with other agencies. She also asserted that Nationwide coerced her into signing the MOU by threatening to terminate her agency and then breached it by unilaterally rejecting her accountant's business plan. She further claimed that Nationwide designed the Modified AE Program to fail by changing the method of calculating the minimum production requirements to a 12-month moving basis while burdening her with loan payments, withholding a cash infusion, and diverting her commissions. Then, after terminating her, it invaded her privacy by using her name on its mailings.

{¶ 25} Lucarell presented expert testimony that she suffered $4.8 million in lost earnings projected over a 25-year career, with a present value of $2.817 million. And Michael Weisenburger, a former employee at Nationwide Federal Credit Union, testified that her business plan had been fraudulently altered by her sales manager to allow her to qualify for the loan.

{¶ 26} The trial court directed a verdict in favor of Nationwide on her fraudulent misrepresentation claim but allowed the remaining claims to go forward.

{¶ 27} Nationwide presented its expert, Rebekah Smith, who opined that Lucarell's agency could not have survived for 25 years because her negative cash flow would result in more than a million dollars in losses in the first 9 years. Smith noted that Lucarell's tax forms and reported expenses revealed an unexplained shortfall of $456,825 and that the agency had no value, so that Lucarell suffered no damages.

{¶ 28} The jury returned verdicts in favor of Lucarell on all remaining claims and counterclaims: $4.2 million in lost profits on the breach of contract claims, $1.5 million in lost profits and $500,000 in emotional damages for the claim of constructive discharge, $400,000 for the retaliation claim plus $100,000 in costs to defend the counterclaim, and $10 in nominal damages and $100,000 in emotional damages on the claim for invasion of privacy. It also awarded $36 million in

punitive damages, consisting of $20 million for constructive discharge, $11 million for retaliation, and $5 million for invasion of privacy.

{¶ 29} The trial court reduced the $5.7 million award for lost profits on the breach of contract and constructive discharge claims to $2.817 million to conform the verdict to the evidence, reduced the retaliation verdict to $250,000 in conformity with statutory caps on noneconomic damages and to reflect the lack of evidence of defense costs on the counterclaim, and also reduced the $36 million punitive damages award to $10.5 million pursuant to the statutory cap on punitive damages. It entered judgment for $3,667,010 in compensatory damages, $10.5 million in punitive damages, $187,546.50 in attorney fees, $21,557.64 in costs, and prejudgment interest.

*Appellate Proceedings*

{¶ 30} Both parties appealed. The appellate court affirmed the verdicts in favor of Lucarell on the breach of contract claims, because Nationwide's failure to request interrogatories precluded review of the findings that it breached the contracts. 2015-Ohio-5286, 44 N.E.3d 319, ¶ 71. It noted that the trial court may have erred when it failed to instruct the jury on the burden to prove duress by clear and convincing evidence; nonetheless, it explained, the trial court had given instructions on two separate defenses to the releases—duress and prevention of performance—and because Nationwide had not requested interrogatories to indicate which issue the jury resolved in Lucarell's favor, the appellate court presumed that the jury found the releases could be avoided because Nationwide prevented Lucarell's performance, rendering harmless any error in instructing the jury on duress. *Id.* at ¶ 80-82. The appellate court affirmed the judgment against Nationwide on the invasion of privacy claim but reduced punitive damages on that claim to $200,020, and it affirmed the judgment denying Nationwide's counterclaim for the balance of its loan. *Id.* at ¶ 90, 142, 154. However, it reversed

the judgments in favor of Lucarell on the retaliation and constructive discharge claims because they were not supported by the evidence. *Id*. at ¶ 123.

{¶ 31} In connection with Lucarell's cross-appeal, the appellate court reversed the directed verdict on her claims that Nationwide fraudulently induced her to join the AE Program by leading her to anticipate revenues of $200,000 a year when it knew or should have known that its AE Program agents were failing and that it had fraudulently altered her loan application to mislead the bank into giving her a loan. *Id*. at ¶ 172. The court remanded that claim for a new trial, including "punitive damages on her breach of contract claims, which can be awarded if the jury finds in Lucarell's favor on the fraud claim." *Id*. at ¶ 191.

*Appeal to the Ohio Supreme Court*

{¶ 32} Nationwide appealed to this court, urging that the appellate court ignored precedent that punitive damages are not recoverable in breach of contract claims. It asserts that it had no need to seek interrogatories on how it breached the contracts because there is no evidence of any breach. It also contends that as a matter of law, the prevention of performance doctrine does not apply to a release, which is fully performed at the moment it is signed. And finally, Nationwide maintains that the appellate court erred in reinstating Lucarell's fraud claim, because she could not reasonably have relied on a pro forma, which is only a projection, she failed to establish that Nationwide knew program agents were failing at the time it recruited her, and even if Nationwide altered her loan documents to get a loan for her, she could not have personally relied on representations that Nationwide made to third parties. It did not, however, appeal from the judgment of the court of appeals in connection with the claim for invasion of privacy or its counterclaim on the note, and those matters are not before us.

{¶ 33} Lucarell asserts that the appellate court did not hold that punitive damages could be recovered for breach of contract but rather that punitive damages could be awarded because her contract claims were accompanied by connected but

12

independent torts—fraudulent misrepresentation and breach of the implied duty of good faith and fair dealing. She notes that it was Nationwide's failure to seek interrogatories that now precludes review of the jury's verdict in her favor on the breach of contract claims, and she further suggests that the jury found that the releases did not cover any of her claims and were void because Nationwide procured them through fraud and duress. She also asserts that Nationwide prevented her from performing her contractual obligations, so that the releases do not bar her claims, and in any case, she was not required to comply with a contract when the other party engaged in bad faith. Lastly, she maintains that evidence supporting her fraud claims includes representations that she would earn $200,000 a year in the AE Program when Nationwide knew agents were failing in that program and other testimony that Nationwide fraudulently altered loan applications.

{¶ 34} Accordingly, we are asked to address whether punitive damages may be awarded for breach of contract, whether the appellate court erred in failing to review assignments of error challenging the breach of contract verdicts and the jury instructions on duress, whether the prevention of performance doctrine permits Lucarell to avoid the releases of liability she signed, and whether she proved that Nationwide defrauded her.

### Law and Analysis

*Punitive Damages*

{¶ 35} Ohio common law provides that punitive damages may not be awarded for breach of contract, no matter how willful the breach. *Digital & Analog Design Corp. v. N. Supply Co.,* 44 Ohio St.3d 36, 46, 540 N.E.2d 1358 (1989); *Davis v. Tunison*, 168 Ohio St. 471, 474, 155 N.E.2d 904 (1959). The court articulated this rule almost a century ago in *Ketcham v. Miller,* 104 Ohio St. 372, 136 N.E. 145 (1922), paragraph two of the syllabus: "Punitive damages are not recoverable in an action for breach of contract."

**{¶ 36}** Nonetheless, Ohio appellate courts, including the Seventh District Court of Appeals in this case, have suggested that there is an "exception" to the common law rule and that punitive damages may be awarded if a breach of contract is accompanied by a connected but independent tort. *See, e.g.*, *Lucarell*, 2015-Ohio-5286, 44 N.E.3d 319, at ¶ 177; *Meisel v. Buildt*, 8th Dist. Cuyahoga No. 70168, 1996 WL 596451, *6 (Oct. 17, 1996); *Goldfarb v. The Robb Report, Inc.*, 101 Ohio App.3d 134, 140, 655 N.E.2d 211 (10th Dist.1995).

**{¶ 37}** However, this court has never recognized an exception to the common law rule precluding the award of punitive damages for breach of contract. Although we have noted that the *conduct* constituting a breach of contract can also constitute a tort, we have made clear that punitive damages are available only when the claimant "suffered a harm distinct from the breach of contract action and attributable solely to the alleged tortious conduct." *Shimola v. Nationwide Ins. Co.*, 25 Ohio St.3d 84, 86, 495 N.E.2d 391 (1986). Thus, punitive damages " 'are recoverable for a tort committed in connection with, but independently of, the breach of contract, where the essentials of an award of such damages are otherwise present, the allowance of such damages being for the tort and not for the breach of contract.' " *Saberton v. Greenwald*, 146 Ohio St. 414, 426, 66 N.E.2d 224 (1946), quoting 25 Corpus Juris Secundum, Damages, Section 120, at 716.

**{¶ 38}** We recently applied this principle in *Sivit v. Village Green of Beachwood, L.P.*, 143 Ohio St.3d 168, 2015-Ohio-1193, 35 N.E.3d 508. In that case, a fire caused by negligent construction and maintenance destroyed an apartment building; the jury awarded the tenants punitive damages, and the trial court declined to apply the statutory cap on punitive damages provided by R.C. 2315.21. *Sivit v. Village Green of Beachwood, L.P.*, 8th Dist. Cuyahoga No. 98401, 2013-Ohio-103, ¶ 66. The court of appeals affirmed, explaining that the statutory cap applies only to a "tort action," which pursuant to R.C. 2315.21(A)(1), "does not include a civil action for damages for a breach of contract or another agreement

between persons." The appellate court reasoned that the cap did not apply to the tenants' award, because "Landlord-Tenant agreements are contractual in nature and injurious conduct arising out of the contract is not a tort action." *Id*. at ¶ 59.

{¶ 39} We reversed that determination and explained that although the tenants' claims sounded both in contract and in tort, punitive damages could be awarded only for the tortious conduct, not for the breach of contract. *Sivit*, 143 Ohio St.3d 168, 2015-Ohio-1193, 35 N.E.3d 508, at ¶ 5. Thus, when a breach of contract involves conduct that also constitutes a tort, punitive damages may be awarded only for the tort, not for the breach, *Saberton* at 426, and any punitive damages awarded are subject to statutory limitations on punitive damages imposed in R.C. 2315.21, *Sivit* at ¶ 5.

{¶ 40} Accordingly, punitive damages are not recoverable for the breach of contract claims Lucarell alleged in her amended complaint, including her claim that Nationwide breached its implied contractual duty of good faith and fair dealing.

*Breach of Contract*

{¶ 41} A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach. *See Natl. City Bank of Cleveland v. Erskine & Sons*, 158 Ohio St. 450, 110 N.E.2d 598 (1953), paragraph one of the syllabus; *Tidewater Fin. Co. v. Cowns*, 197 Ohio App.3d 548, 2011-Ohio-6720, 968 N.E.2d 59, ¶ 12 (1st Dist.); *Carpenter v. Long*, 196 Ohio App.3d 376, 2011-Ohio-5414, 963 N.E.2d 857, ¶ 220 (2d Dist.); *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66, ¶ 18 (10th Dist.).

{¶ 42} In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement. *See Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (1996); Restatement of the Law 2d, Contracts, Section 205 (1981); *see also*

R.C. 1301.304. We have recognized that " ' "[g]ood faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could have not been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.' " *Ed Schory & Sons* at 443-444, quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990).

**{¶ 43}** As a comment in the Restatement explains, "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement, Section 205, comment a. However, we have rejected the contention that a party breaches the implied duty of good faith and fair dealing merely by seeking to enforce the contract or by acting as permitted by its express terms. *Ed Schory & Sons* at 443-444; *see also Wendy's Internatl., Inc. v. Saverin*, 337 Fed.Appx. 471, 477 (6th Cir.2009) (applying Ohio law); 23 Lord, *Williston on Contracts*, Section 63:22 (4th Ed.2003). Thus, there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance. *See Ed Schory & Sons* at 443-444; 23 Lord, Section 63:22; Restatement, Section 205, comment e.

**{¶ 44}** Courts in Ohio have therefore recognized that there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract. *E.g*., *Patrick v. CitiMortgage, Inc.*, 676 Fed.Appx. 573, 577 (6th Cir.2017); *Macklin v. Citimortgage, Inc.*, 8th Dist. Cuyahoga No. 101077, 2015-Ohio-97, ¶ 14; *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. Franklin No. 04AP-980, 2006-Ohio-638, ¶ 98.

**{¶ 45}** Although Nationwide asserted in the court of appeals that Lucarell failed to prove any breach of contract, that court concluded that it could not review

the error assigned because Nationwide had failed to request special interrogatories to determine whether the jury found a breach of an express term of the contracts, the implied duty, or both.

{¶ 46} Contrary to the view of the court of appeals, this assignment of error is reviewable. It is true that when there are two causes of action raising distinct issues and the jury returns a general verdict not tested by special interrogatories, a reviewing court will presume that the jury resolved all issues in favor of the successful party. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 185, 729 N.E.2d 726 (2000). According to this "two-issue rule," if one issue has been tried free from error, any error relating to the second issue is deemed harmless as a matter of law. *Id.*; *Wagner v. Roche Laboratories*, 85 Ohio St.3d 457, 460, 709 N.E.2d 162 (1999) ("The two-issue rule is in essence a rule concerned with prejudice").

{¶ 47} However, the court of appeals erred in applying the two-issue rule. Because there is no separate cause of action for breach of the implied duty of good faith and fair dealing, Lucarell's contract claims fail unless she proved Nationwide breached specific obligations imposed by the contracts. The court of appeals was therefore obligated to determine whether sufficient evidence supported the jury's verdicts on the contract claims, and its failure to conduct this review violates App.R. 12 and is reversible error.

*Defenses to the Releases*

{¶ 48} A release is an absolute bar to a later action on any claim encompassed within it, absent a showing of fraud, duress, or other wrongful conduct in procuring it. *See Haller v. Borror Corp.*, 50 Ohio St.3d 10, 13, 552 N.E.2d 207 (1990); *O'Donnel v. Langdon*, 170 Ohio St. 528, 530, 166 N.E.2d 756 (1960), *overruled on other grounds, Sloan v. Std. Oil Co.*, 177 Ohio St. 149, 203 N.E.2d 237 (1964), paragraph one of the syllabus; 29 Lord, Section 73:14, at 42. However, a release procured by fraud in the inducement or under duress is

"voidable only, and can be contested only after a return or tender of consideration." *Haller* at 14.

Duress

**{¶ 49}** Avoiding a release on the basis that it was procured through duress requires proof of coercion by the other party to the contract. *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 246, 551 N.E.2d 1249 (1990). But as the court explained in *Blodgett*, "[a] person who claims to have been a victim of economic duress must show that he or she was subjected to '* * * a wrongful or unlawful act or threat, * * * ' and that it '* * * deprive[d] the victim of his unfettered will.' " (Ellipses and bracket in *Blodgett*.) *Id.* at 246, quoting 13 *Williston on Contracts*, Section 1617, at 704 (3d Ed.1970). "The real and ultimate fact to be determined in every case is whether the party affected really had a choice; whether he had his freedom of exercising his will." *Tallmadge v. Robinson*, 158 Ohio St. 333, 340, 109 N.E.2d 496 (1952).

**{¶ 50}** The court has not yet definitively set forth the standard of proof that applies when a party seeks to avoid a release on the grounds that it was procured through duress. It is apparent that we require clear and convincing evidence to establish other contract defenses such as fraudulent misrepresentation (*see Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph two of the syllabus) and mutual mistake (*see Sloan* at paragraph one of the syllabus). In *Std. Sanitary Mfg. Co. v. George*, 118 Ohio St. 564, 162 N.E. 35 (1928), we suggested that clear and convincing evidence should be required to prove duress, *id.* at 575.

**{¶ 51}** Our review further reveals that the prevailing rule in other jurisdictions is that the party asserting duress has the burden of proving it by clear and convincing evidence. *E.g.*, *Country Cove Dev., Inc. v. May*, 143 Idaho 595, 599, 150 P.3d 288 (2006); *Hawken Northwest, Inc. v. State Dept. of Administration*, 76 P.3d 371, 377 (Alaska 2003); *Berardi v. Meadowbrook Mall Co.*, 212 W.Va. 377, 382, 572 S.E.2d 900 (2002); *Holland v. FEM Elec. Assn., Inc.*, 2001 S.D. 143,

637 N.W.2d 717, ¶ 10; *Isaac v. First Natl. Bank of Maryland, D.C.*, 647 A.2d 1159, 1162-1163 (D.C.1994); *B & W Const. Co. v. N.C. Ribble Co.*, 105 N.M. 448, 450, 734 P.2d 226 (1987); *Wurtz v. Fleischman*, 97 Wis.2d 100, 110-111, 293 N.W.2d 155 (1980); *Pagano v. Walker*, 539 P.2d 452, 454 (Utah 1975); *Donner v. Donner*, 46 Wash.2d 130, 132, 278 P.2d 780 (1955); 28 Lord, Section 71:10, at 460.

**{¶ 52}** Accordingly, today we hold that a party seeking to avoid a release of liability on the basis that it was procured under duress is required to prove duress by clear and convincing evidence. The trial court therefore erred in giving an instruction that allowed the jury to find duress by a preponderance of the evidence rather than by clear and convincing evidence.

Prevention of Performance

**{¶ 53}** Although the court of appeals acknowledged that the trial court's duress instruction "may have been in error," 2015-Ohio-5286, 44 N.E.3d 319, ¶ 80, it noted that the jury had also been instructed that Lucarell would be excused from performing under the contracts if Nationwide had prevented her performance. And because Nationwide did not seek special interrogatories to indicate which of these defenses the jury resolved in Lucarell's favor, the appellate court again applied the two-issue rule and presumed that the jury found that prevention of performance allowed Lucarell to avoid the releases. This reasoning confuses two legal doctrines.

**{¶ 54}** The prevention of performance doctrine provides that a party who prevents another from performing its contractual obligations cannot rely on that failure of performance to assert breach of contract. *Suter v. Farmers' Fertilizer Co.*, 100 Ohio St. 403, 126 N.E. 304 (1919), paragraph four of the syllabus; *Buckley Towers Condominium, Inc. v. QBE Ins. Corp.*, 395 Fed.Appx. 659, 662 (11th Cir.2010); 13 Lord, Section 39:3, at 569-571. "[T]he doctrine is based on the long-established principle of law that a party should not be able to take advantage of its own wrongful act." 13 Lord, Section 39:6, at 582.

**{¶ 55}** The other legal doctrine involves a release of liability. "[A] release is a binding agreement between the parties under which at least one party to the agreement relinquishes an existing claim or cause of action against another party to the agreement * * *." 29 Lord, *Williston on Contracts*, Section 73:1, at 8 (4th Ed.2003). It is effective on execution and delivery, discharging the duty owed to the releasor either immediately or upon occurrence of a condition. Restatement of the Law 2d, Contracts, Section 284, at 392 (1981); *see also Leonard v. Kebler's Admr.*, 50 Ohio St. 444, 453, 34 N.E. 659 (1893), quoting 1 Daniel, *Negotiable Instruments*, Section 63, at 81 (4th Ed.1891) (" 'Delivery is the final step necessary to perfect the existence of any written contract' "); *Hartford Fire Ins. Co. v. Whitman*, 75 Ohio St. 312, 319, 79 N.E. 459 (1906) ("It is a general rule that delivery is necessary to the validity of a written instrument").

**{¶ 56}** Thus, when a party signs and delivers a release, that party relinquishes all claims encompassed within it and has no other contractual or other duties to perform. The analysis of the court of appeals that the jury in this case could have found prevention of performance to be a defense to a release is therefore erroneous as a matter of law—no further performance by Lucarell was needed for the releases she signed to be effective.

**{¶ 57}** For this reason, the appellate court also erred in applying the two-issue rule and in failing to determine whether the erroneous jury instruction constitutes reversible error. An error in instructing the jury is reversible only if "the jury charge was so misleading and prejudicial as to result in an erroneous verdict," *Hayward v. Summa Health Sys./Akron City Hosp.,* 139 Ohio St.3d 238, 2014-Ohio-1913, 11 N.E.3d 243, ¶ 25, based on a " 'thorough review of the entire transcript of proceedings before the trial court,' " *id.*, quoting *Hampel*, 89 Ohio St.3d at 186, 729 N.E.2d 726.

**{¶ 58}** The only way to hold that the trial court's instruction was not prejudicial, however, would be to find that Lucarell demonstrated by clear and

convincing evidence that she had signed the releases as a result of duress. But here, there is scant evidence proving duress. Importantly, in signing the Modified AE Program Agreement, she expressly "represent[ed] and warrant[ed] to Nationwide that [she] has made the decision to continue in the AE Program while under no economic duress," and she agreed that she "has entered this Modification voluntarily and of [her] own accord."

{¶ 59} And although she testified that in June 2008 Nationwide had threatened to withhold her next cash infusion if she did not sign the Modified AE Program Agreement, she received the cash infusion the next month, and in any case, the cash infusions—which totaled $214,922 from February 2007 to September 2008—were not yet required by any contract but rather were good faith advances on money that Lucarell would be entitled to receive only after she signed the Modified AE Program Agreement.

{¶ 60} In light of the limited evidence in the record, the failure to instruct the jury on the heightened standard of proof was prejudicial. Accordingly, if the court of appeals holds that the trial court did not err in allowing the contract claims to go to the jury, a new trial is required based upon the erroneous jury instruction on duress.

*Fraud*

{¶ 61} The elements of a fraud claim are stated in *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170:

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the

representation or concealment, and (f) a resulting injury proximately caused by the reliance."

*Id.* at ¶ 47, quoting *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987).

{¶ 62} Here, the court of appeals concluded that there were triable issues of fraud based on evidence that Nationwide led Lucarell to believe she would earn $200,000 a year in commissions when it knew or should have known that its AE program agents were failing, that sales managers had a financial incentive to recruit new program agents, and that someone fraudulently altered Lucarell's loan application to mislead the bank into giving her a loan. 2015-Ohio-5286, 44 N.E.3d 319, at ¶ 172.

{¶ 63} However, a party cannot predicate fraud on predictions or projections relating to future performance; rather, we have long recognized that to be actionable, a misrepresentation must involve a matter of fact that relates to the past or present. *See Block v. Block*, 165 Ohio St. 365, 377, 135 N.E.2d 857 (1956); *Armstrong v. Karshner*, 47 Ohio St. 276, 24 N.E. 897 (1890), paragraph one of the syllabus. Thus, a pro forma is "not * * * an actionable representation because it is a prediction about the future, not a statement about the past or even the present." *Bye v. Nationwide Mut. Ins. Co.*, 733 F.Supp.2d 805, 819 (E.D.Mich.2010); *see also Rorig v. Thiemann*, S.D.Ohio No. 1:05CV801, 2007 WL 2071909, *7 (July 17, 2007) ("a proforma by definition represents figures based on financial assumptions or projections").

{¶ 64} Further, while Lucarell asserted that her sales manager showed her a sample pro forma indicating that she could earn an average of $200,000 in commissions and revenue a year over five years, the pro forma included a disclaimer that Nationwide could not guarantee any results, and Lucarell testified that she understood that the pro forma contained "projections" of what she could

22

be earning, not a "promise or guarantee." Lucarell therefore could not reasonably rely on the pro forma because predictions of future financial performance are speculative and subject to changing economic conditions. *See Bye* at 822 (fraud claim based on pro forma projections "is ultimately foreclosed by the fact that any reliance * * * on such representations * * * was unreasonable").

{¶ 65} In addition, there is no evidence that Nationwide knew its program agents were failing when it recruited her in 2005; rather, the testimony at trial indicated that the program agents were not struggling initially because "they were relatively well capitalized, but as time went by, they started to struggle financially." A witness testified that it was in 2006, after Lucarell's recruitment, that Nationwide "became aware of perceived shortcomings in the design of the program." Thus, testimony that sales managers had an incentive to recruit new program agents cannot be the basis for a claim for fraudulent misrepresentation, and in any case, witnesses explained that Nationwide wanted the program agents to succeed and build viable insurance businesses.

{¶ 66} Lastly, the effort by Lucarell to assert fraud based on a representation made to a third party but not to her does not state a cause of action for fraud. *See Wells v. Cook*, 16 Ohio St. 67, 74 (1865). Although Lucarell asserts that the altering of her loan application "was in furtherance of Nationwide's fraudulent scheme," she failed to prove that any fraudulent misrepresentation regarding that application had been made to her. The trial court therefore properly directed a verdict on Lucarell's fraud claim.

## Conclusion

{¶ 67} We reaffirm and follow the common law rule articulated in *Ketcham*: "Punitive damages are not recoverable in an action for breach of contract." 104 Ohio St. 372, 136 N.E. 145, at paragraph two of the syllabus. Even if the conduct constituting a breach of contract is also a tort, punitive damages may be awarded only for the tort and are subject to the statutory limitations provided in R.C.

2315.21. Thus, punitive damages are not recoverable on a claim for breach of contract, including a claim for breach of the implied duty of good faith and fair dealing.

{¶ 68} We clarify today that the doctrine of prevention of performance is separate from and not a defense to a release of liability. An unconditional release of liability becomes effective upon execution and delivery and bars any claims encompassed within it, unless it was procured by fraud, duress, or other wrongful conduct. A claimant asserting duress is required to prove duress by clear and convincing evidence. Although the prevention of performance doctrine precludes a party who prevents another from performing its contractual obligations from relying on that failure of performance to assert a claim for breach of contract, it has nothing to do with a release of liability, which requires no further performance by the releasor to be effective. Lastly, a fraud claim cannot be predicated on predictions or projections relating to future performance or on misrepresentations made to third parties.

{¶ 69} For these reasons, we reverse the judgment of the court of appeals that affirmed the trial court's judgment on the breach of contract claims and on the fraud claim, and we reinstate the directed verdict on the fraud claim entered by the trial court. We further recognize that Nationwide did not appeal the judgment on the invasion of privacy claim, its counterclaim on the note, or the award of attorney's fees and costs, and Lucarell did not appeal the dismissal of her constructive discharge and retaliation claims. Accordingly, those matters are not before us, and we make no ruling in connection with those claims.

{¶ 70} The matter is remanded to the court of appeals for further proceedings consistent with this opinion.

Judgment accordingly.

O'CONNOR, C.J., and KENNEDY, FRENCH, FISCHER, and DEWINE, JJ., concur.

O'NEILL, J., concurs that punitive damages are not recoverable in an action for breach of contract and dissents from the remainder of the opinion and the judgment.

_____

Randy J. Hart, A. Scott Fromson, and Patricia A. Morris, for appellee.

Baker & Hostetler L.L.P., Thomas D. Warren, and G. Karl Fanter; Jones Day and Yvette McGee Brown; and Bricker & Eckler L.L.P., and Quintin Lindsmith, for appellant.

Vorys, Sater, Seymour and Pease, L.L.P., Thomas E. Szykowny, and Rebecca E. Wilson, urging reversal for amici curiae Ohio Insurance Institute, Ohio Chamber of Commerce, Ohio Alliance for Civil Justice, Ohio Manufacturers' Association, and National Association of Mutual Insurance Companies.

_____