NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0220n.06

No. 24-3792

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
April 25, 2025
KELLY L. STEPHENS, Clerk

IRONSHORE INDEMNITY, INC.,

      Plaintiff-Appellee,

v.

EVENFLO COMPANY, INC.,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

**REDACTED OPINION**
(See Appendix on page 15)

---

Before: COLE, STRANCH, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** Evenflo Company, Inc. maintained an insurance policy with Ironshore Indemnity, Inc. The policy had at least one notable feature: it endowed Ironshore discretion to settle covered claims against Evenflo and promptly recoup those payments from its insured. Eventually, Ironshore exercised this discretion, twice settling and satisfying product liability suits against Evenflo. Each time, it did so largely over the objection of Evenflo, which, the record reveals, seemingly had a better sense of the litigation risks facing the company than did Ironshore. On that basis and others, Evenflo refused to reimburse Ironshore for the settlement payments made on its behalf. Ironshore countered by suing Evenflo for breaching the parties' contract.

Evenflo's frustration is understandable. But the terms of the agreement afforded Ironshore wide discretion to resolve litigation against Evenflo on terms selected by Ironshore. Accordingly, we affirm the district court's decision granting Ironshore summary judgment.

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

I.

Evenflo manufactures an assortment of adolescent travel and home safety products, including car seats, strollers, highchairs, and baby gates. To manage risk, the company purchased a series of insurance policies. One such policy was obtained from (and later renewed with) Ironshore (the "Policy").

A. In industry parlance, Ironshore provided Evenflo with a "fronting policy" containing a "matching deductible" provision. That meant, in simpler terms, Evenflo was obligated to reimburse Ironshore for amounts the insurer paid in defending and settling product liability claims, up to applicable limits. So despite technically being insured under the Policy, Evenflo largely bore the risk of loss. *See White v. Ins. of the State of Pa.*, 405 F.3d 455, 457 (6th Cir. 2005) (explaining fronting in greater detail).

Why, one might ask, did Evenflo enter into such a policy? Likely because various states in which Evenflo does business require it "to maintain proof of financial responsibility," and the nominal insurance provided by Ironshore's fronting policy allows Evenflo to comply with these requirements. *Gilchrist v. Gonsor*, 821 N.E.2d 154, 158 (Ohio 2004) (Stratton, J., dissenting). In effect, Evenflo "rent[ed]" Ironshore's "licensing and filing capabilities" so it could comply with state insurance requirements. *Id.* (citation omitted). But at the same time, Evenflo promised to reimburse Ironshore for any payments made on Evenflo's behalf, essentially turning the manufacturer into its own insurer for amounts up to the Policy's limits. Consistent with these goals, the Policy repeatedly explained that Evenflo must "promptly reimburse" Ironshore for payments made up to specified thresholds. *E.g.*, R. 60-3, PageID#461–63; R. 60-4, PageID#508–10. Those reimbursements covered damages and settlements alike: "[Ironshore] will have the

2

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

right and duty to defend [Evenflo] against any 'suit' seeking [certain bodily injury and property] damages. . . . [Ironshore] may, at [its] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." R. 60-3, PageID#452; R. 60-4, PageID#499.

Evenflo maintained additional coverage through commercial umbrella and excess insurance policies. In one policy, Ironshore Europe, a seeming affiliate of Ironshore, covered up to an additional $25 million once Evenflo's liability exceeded the Policy's limits. A second policy, one with American Guarantee Liability Insurance Company ("AGLIC"), covered up to another $25 million if liability exceeded the amount covered by the other policies. In a nutshell, then, Evenflo enjoyed up to $50 million in coverage once it paid the Policy's applicable limit (effectively its deductible). For today's purposes, one such limit bears noting: $5 million, representing both the per-occurrence limit for lawsuits involving car seats as well as the maximum sum Ironshore would pay out on Evenflo's behalf in a single year.

B. This risk-shifting framework soon proved important in two lawsuits.

*The Florida Lawsuit.* In one, a child suffered serious injuries while seated in an Evenflo booster seat during a car accident in Florida.

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

████████████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████████████████.

The trial court barred the jury from finding that the injured child's mother, also the vehicle's driver, was comparatively negligent in using the booster seat. In other words, while defense counsel could still claim the seat was misused, the jury could not "assign any percentage of fault to the mother based on how she used the booster seat or seatbelt (only her driving and the happening of the accident)." R. 60-17, PageID#581. ████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████.

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████.

*The California Lawsuit.* Evenflo was also named in a similar suit arising out of an auto accident in California. ████████████████████████████████████████████████. The plaintiff's claim against Evenflo sounded in strict liability under California law. That meant that if Evenflo was deemed liable to any degree, it would be jointly and severally liable for all economic damages. *See Evangelatos v. Superior Ct.*, 753 P.2d 585, 590 (Cal. 1988); Cal. Civ. Code § 1431.2(a). And because the injured child's life care plan totaled ████████, the potential liability for Evenflo, Ironshore, and perhaps even AGLIC (after accounting for noneconomic damages, such as pain and emotional distress), was substantial.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████.

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ .

C.  Relying on the Policy, Ironshore demanded Evenflo reimburse it ███████, the combined total of the two settlements.  When Evenflo refused, Ironshore sued Evenflo for breach of contract and for a declaratory judgment.  Evenflo counterclaimed on various theories, including for a declaratory judgment as well.  Ironshore moved for summary judgment.  The district court dismissed the declaratory judgment claims but granted Ironshore summary judgment on its breach of contract claim.  Evenflo now appeals that decision.

II.

We review a district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the nonmovant's favor.  *Hall v. Navarre*, 118 F.4th 749, 756 (6th Cir. 2024).  Summary judgment is warranted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see* Fed. R. Civ. P. 56(a).

We also review de novo a district court's interpretation of state law.  *Hinman v. ValleyCrest Landscaping Dev., Inc.*, 89 F.4th 572, 574 (6th Cir. 2024).  Here, the parties agree that Ohio law governs our reading of the Policy.  *See Wesco Ins. v. Roderick Linton Belfance, LLP*, 39 F.4th 326, 335 (6th Cir. 2022).

A.  The issues before us tie back to the Policy.  As no party contests the formation of this agreement, we turn to its terms.  Under Ohio law, we "give effect to the intentions of the parties as expressed in the language of their written agreement," in this case, the Policy.  *Sutton Bank v.*

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

*Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 552 (Ohio 2020). More specifically, we must apply "the plain and ordinary meaning of the language used in the [Policy] unless another meaning is clearly apparent from the [Policy's] contents." *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 248 N.E.3d 196, 200–01 (Ohio 2024) (quoting *Sunoco, Inc. v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011)). Assuming that contractual language "is clear," we "look no further than the" Policy itself "to find the intent of the parties." *Id.* at 201.

With this text-based interpretive approach in mind, recall the policy language providing that Ironshore "may, at [its] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." R. 60-3, PageID#452 (fronting policy applicable to Florida lawsuit); R. 60-4, PageID#499 (fronting policy applicable to California lawsuit). If Ironshore reached a settlement, then the Policy obligated Evenflo to "promptly reimburse" Ironshore up to applicable policy limits. R. 60-3, PageID#461–63; R. 60-4, PageID#508–10. Neither party disputes that the Florida and California lawsuits qualify as "suit[s]" under the Policy. Nor does any party dispute that the amounts of the settlements, ▮▮▮▮ and ▮▮▮▮ respectively, land within both the Policy's $5 million per-occurrence limit for car seat litigation as well as the $5 million aggregate limit. Taking all of this together, under the plain text of the Policy, Evenflo has a contractual obligation to reimburse Ironshore ▮▮▮▮.

That conclusion is consistent with the Ohio Supreme Court's reading of a comparable provision in *Marginian v. Allstate Insurance Co.*, 481 N.E.2d 600 (Ohio 1985). There, the insurance policy provided that the insurer "will defend a person insured . . . and[] may settle any claim or suit if [it] feel[s] this is appropriate." *Id.* at 602 (emphasis omitted). When the insurer settled a claim "contrary to the wishes of the insured," *id.* at 601, Ohio's high court held that the

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

contract "expressly and unambiguously" permitted such an outcome, *id.* at 602. So too here. *See Am. Cas. Co. v. Atl. Painting & Contracting, Inc.*, No. 58928, 1990 WL 100398, at *2 (Ohio Ct. App. July 19, 1990) (per curiam) (applying *Marginian* to fronting policy).

B. Evenflo raises several counterarguments.

*Conditions Precedent.* Evenflo first argues that two contractual prerequisites thwart Ironshore's right to enter reimbursable settlements: Ironshore's "duty to defend" Evenflo, and Ironshore's right to "investigate any 'occurrence.'" R. 60-3, PageID#452; R. 60-4, PageID#499. According to Evenflo, Ironshore honored neither commitment, meaning it could not invoke its purportedly conditional power to enter a compensable settlement on Evenflo's behalf.

Several flaws plague this reading. As an initial matter, the Policy does not specify Ironshore's duty to defend and right to investigate as preconditions to settlement. Rather, those clauses establish a freestanding obligation (duty to defend) and a freestanding power (right to investigate) that, while positioned textually near Ironshore's right to settle, do not foreclose the right if left unsatisfied. Absent a textual basis for imposing a condition precedent, we should not "lightly" infer one. *See Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 222 N.E.3d 621, 629 (Ohio 2023) ("[N]otice provisions are conditions precedent and they are not to be implied lightly."). This is particularly true with respect to Ironshore's right to investigate. The Policy simply states that Ironshore "may, at [its] discretion, investigate." R. 60-3, PageID#452; R. 60-4, PageID#499. Far from a duty, those terms instead convey a freedom to investigate claims. *See May*, 9 *Oxford English Dictionary* 501 (2d ed. 1989) ("Expressing permission or sanction: To be allowed (to do something) by authority, law, rule, morality, reason, etc."); *At the Discretion of*, 4

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

*Oxford English Dictionary* 756 (2d ed. 1989) ("[A]ccording to the discernment or judgement of, according as (he) thinks fit or pleases[] . . . .").

Even if the Policy was "reasonably susceptible" to Evenflo's reading, *Smith v. Erie Ins.*, 69 N.E.3d 711, 716 (Ohio 2016), undisputed facts demonstrate that Ironshore met these alleged conditions. Take first the insurer's duty to defend, a "prior" obligation "triggered by the insured's demand that the insurer provide a defense to a claim of alleged liability." *Twin Maples Veterinary Hosp., Inc. v. Cincinnati Ins.*, 824 N.E.2d 1027, 1030 (Ohio Ct. App. 2005) (quoting *GuideOne Mut. Ins. v. Reno*, No. 01-CA-68, 2002 WL 857682, at *2 (Ohio Ct. App. Apr. 26, 2002), *aff'd sub nom. Cincinnati Ins. v. Anders*, 789 N.E.2d 1094 (Ohio 2003)). ██████

████████████████████████████████████████████████████████

████████.

Nor was there a breach of any investigatory duty placed upon Ironshore. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

These actions, while short of those taken by Evenflo, offered Ironshore insight into the risk exposure faced by both it and its insured. If Ironshore needed to investigate a lawsuit before entering a settlement, it adequately did so in both instances.

*Good Faith and Fair Dealing.* Taking a different tack, Evenflo argues that Ironshore breached its duty of good faith and fair dealing. By way of background, "every contract" governed by Ohio law "imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell v. Nationwide Mut. Ins.*, 97 N.E.3d 458, 469 (Ohio 2018); *see also*

9

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

Restatement (Second) of Contracts § 205(a) (Am. L. Inst. 1981) (describing duty of good faith and fair dealing for contracts involving sales of services); Ohio Rev. Code § 1301.304 (codifying same for goods). In effect, the duty obliges contracting parties to act with "reasonable justification," *Zoppo v. Homestead Ins.*, 644 N.E.2d 397, 400 (Ohio 1994) (citation omitted), and not in an "arbitrary or capricious" manner, *Hoskins v. Aetna Life Ins.*, 452 N.E.2d 1315, 1320 (Ohio 1983) (citation omitted). To Evenflo's eye, Ironshore breached this duty by settling the Florida and California lawsuits without adequately accounting for its insured.

Out of the gate, this argument runs up against a principle of Ohio law: "[T]here is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract." *Lucarell*, 97 N.E.3d at 469. "Thus, there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Id.* Accordingly, while Evenflo's good faith and fair dealing claim sounds in tort, *see Scott Fetzer Co. v. Am. Home Assur. Co.*, 229 N.E.3d 70, 76 (Ohio 2023) (applying tort choice-of-law rules to one such claim), the manufacturer must still tie that claim to a successful breach of contract claim, *see Harmon v. Fifth Third Bancorp*, 858 F. App'x 842, 845 (6th Cir. 2021) (rejecting "standalone breach of implied-covenant claim" given lack of a breach of contract). It has not done so. Indeed, in making this argument, Evenflo operates under the premise that "Ironshore had a contractual right to unilaterally settle claims using Evenflo's money." Appellant Br. 22. In exercising its "unilateral[]" right to settle, *id.*, it follows, Ironshore could not have breached the Policy and therefore could not have violated its duty of good faith and fair dealing.

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

Equally problematic, in Ohio "a cause of action alleging a breach of the insurer's duty of good faith will not lie where the insurer has," as here, "settled such claim within the monetary limits of the insured's policy." *Marginian*, 481 N.E.2d at 603. Perhaps, as Evenflo notes, fronting policies serve a unique purpose and incur a different slate of risks than the more run-of-the-mill insurance coverage at issue in *Marginian*. Yet the manufacturer cites no precedent exempting such policies from *Marginian*'s capacious holding.

Even on its merits, Evenflo's good faith and fair dealing claim is unavailing. Evenflo fails to explain how Ironshore's approach to settling the pending matters amounts to bad faith. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. We likewise see no "arbitrary or capricious" aspects to Ironshore's treatment of Evenflo. *Hoskins*, 452 N.E.2d at 1320. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████.

*Implied Reasonableness.* Next, Evenflo asserts that the Policy contained an implied requirement that Ironshore demonstrate the reasonableness of its settlements before seeking reimbursement. Not so. The parties expressly agreed that Ironshore enjoyed discretion to settle claims on behalf of, and seek reimbursement from, Evenflo. The Policy's unambiguous text confirms as much. Ironshore, the Policy explains, "may" settle claims "at its discretion" and thereafter seek compensation from Evenflo. R. 60-3, PageID#452; R. 60-4, PageID#499; *see Tera, L.L.C.*, 248 N.E.3d at 201 (foreclosing extrinsic evidence when contract is unambiguous). A

reasonableness standard is absent from the relevant language. Had the parties intended otherwise, they would have incorporated language to that effect. But we are obliged to "honor the coverage the parties did—and did not—provide for in their written contracts of insurance." *Santo's Italian Café LLC v. Acuity Ins.*, 15 F.4th 398, 407 (6th Cir. 2021).

Seeing things otherwise, Evenflo cites three cases where Ohio courts set extracontractual reasonableness requirements on one party's attempt to recoup settlement payments from another party. *See Travelers Ins. v. Motorists Mut. Ins.*, 178 N.E.2d 613, 618 (Ohio Ct. App. 1961) (holding insured could recover from its insurer so long as the settlement was "reasonable"); *Globe Indem. Co. v. Schmitt*, 53 N.E.2d 790, 794 (Ohio 1944) (requiring indemnitees' settlements to be "fair and reasonable" before permitting recovery from indemnifying tortfeasors (citation omitted)); *Convention Ctr. Inn, Ltd. v. Dow Chem. Co.*, 590 N.E.2d 898, 900 (Ohio Ct. App. 1990) (similar). But those cases rested "upon general equitable principles" triggered either after the insurer breached its contract, *Travelers*, 178 N.E. 2d at 617 (emphasis omitted) (quoting *Aetna Cas. & Sur. Co. v. Buckeye Union Cas. Co.*, 105 N.E.2d 568, 568 (Ohio 1952)), or where no preexisting indemnification agreement existed, *Globe Indem. Co.*, 53 N.E.2d at 596; *Convention Ctr. Inn, Ltd.*, 590 N.E.2d at 899. That does not describe today's case, where a binding agreement existed, one that was not breached by the insurer.

*Estoppel and Waiver.* Continuing with equitable themes, Evenflo asserts that Ironshore is estopped from seeking reimbursement because the insurer allegedly "induced" Evenflo "to change [its] position in good faith reliance upon" Ironshore's conduct. Appellant Br. 50 (quoting *Turner Liquidating Co. v. St. Paul Surplus Lines Ins.*, 638 N.E.2d 174, 176 (Ohio Ct. App. 1994)).

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ .

      This claim too is a nonstarter. ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ . Any passivity on Ironshore's part thus was not tantamount to inducing a reasonable belief of relinquishment. *Cf. State ex rel. Madden v. Windham Exempted Vill. Sch. Dist. Bd. of Educ.*, 537 N.E.2d 646, 648 (Ohio 1989) ("Silence or inaction alone will not constitute a knowing and voluntary waiver of rights unless one is under an obligation to speak or act."). Indeed, Ironshore's conduct lands far afield from "actual or constructive fraud," a finding that Ohio courts "[g]enerally" require for equitable estoppel. *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 119 (Ohio 2006) (citation omitted).

      Our conclusion applies with even greater force to Ironshore's alleged waiver of its right to settle. In general, "[w]aiver is a voluntary relinquishment of a known right." *Id.* at 118 (citation omitted). And the waiver "must be intentional." *State Farm Mut. Auto. Ins. v. Ingle*, 904 N.E.2d 934, 939 (Ohio Ct. App. 2008) (citation omitted). As just discussed, Ironshore never voluntarily relinquished its right to settle, let alone intentionally so.

      *Course of Conduct.* Lastly, Evenflo argues that the parties altered the Policy through their course of dealing and performance. In Ohio, "[p]arties may implicitly modify an agreement by their actions," such as through "[a] continued, different course of performance" in the disputed

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

contract, *City of St. Marys v. Auglaize Cnty. Bd. of Comm'rs.*, 875 N.E.2d 561, 568 (Ohio 2007) (quotations and citation omitted), or through a different "course of dealing" in their prior interactions, *City of Cincinnati v. Cincinnati Gaslight & Coke Co.*, 41 N.E. 239, 241 (Ohio 1895). But evidence demonstrating as much must be "clear and convincing." *Barclay Petroleum, Inc. v. Bailey*, 96 N.E.3d 811, 820 (Ohio Ct. App. 2017) (citation omitted); *see also City of Cincinnati*, 41 N.E. at 241 ("To have any value as a practical construction, the course of dealing should be uniform, unquestioned, and fully concurred in by both parties.").

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. Once more, we disagree. Even if Ironshore never previously settled claims on Evenflo's behalf, the Policy merely established discretion—not an obligation—for the insurer to do so. Equally true, as mentioned, Ironshore's invocation of its settlement right at a relatively late stage of litigation is entirely consistent with the right's discretionary nature. That a party sparsely invokes a contractual right does not mean they intend to relinquish the right altogether. We thus see no "mutual intent" to modify the Policy. *Barclay Petroleum*, 96 N.E.3d at 820 (citation omitted).

\* \* \* \* \*

We affirm.

No. 24-3792, *Ironshore Indemnity, Inc. v. Evenflo Company, Inc.*

**APPENDIX**

On April 25, 2025, the court filed the opinion and judgment in this case under temporary seal. Pursuant to the joint motion for redactions filed by the parties, the court released the redacted opinion on May 9, 2025. The date the opinion is deemed to have been filed remains April 25, 2025.