[Cite as *Harris v. Sunsong Holdings, Inc.*, 2021-Ohio-1213.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

| | | |
|---|---|---|
| LARRY G. HARRIS, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | Appellate Case No. 28645 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-5530 |
| | : | |
| SUNSONG HOLDINGS, INC., et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of April, 2021.

. . . . . . . . . . .

RICHARD A. TALDA, Atty. Reg. No. 0023395, and DANIEL J. GENTRY, Atty. Reg. No. 0065283, 33 West First Street, Suite 200, Dayton, Ohio 45402
    Attorneys for Plaintiffs-Appellants

D. JEFFREY IRELAND, Atty. Reg. No. 0010443, 110 North Main Street, Suite 1600, Dayton, Ohio 45402
and
JASON W. PALMER, Atty. Reg. No. 0088336, and MELISSA L. WATT, Atty. Reg. No. 0092305, 201 East Fifth Street, Suite 1420, Cincinnati, Ohio 45202
    Attorneys for Defendants-Appellees

. . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Plaintiffs-appellants, Larry G. Harris, Kristina L. Harris and HMFG Group Limited Partnership, appeal from the trial court's judgment of November 20, 2019, in favor of Defendants-appellees, Sunsong Holdings, Inc., Qingdao Sunsong Co., Ltd. and Harco Manufacturing Group, LLC (collectively "Sunsong"), following a bench trial. Raising five assignments of error, Appellants argue that the trial court's judgment was not supported by the evidence, and that the trial court erred in its application of the law, by finding that predictions and statements of opinion were actionable misrepresentations for purposes of a claim of fraud; that Sunsong justifiably relied on the predictions and statements of opinion in question; that Appellants breached their contract with Sunsong, pursuant to which Sunsong purchased Appellants' business; that the trial court's award of damages to Sunsong amounted to a windfall; and that the trial court erred by including attorney's fees and prejudgment interest in the award. For the following reasons, we hold that the trial court's judgment was supported by competent, credible evidence, and that the trial court correctly applied the law. The trial court's judgment is therefore affirmed.

## I. Facts and Procedural History

{¶ 2} In 2014, Appellants Larry and Kristina Harris owned several corporations, including Harco Industries, Inc., which was registered with the Ohio Secretary of State in 1980; Harco Brake Systems, Inc., which was registered in 1997; and Harco Manufacturing Group, LLC, which was registered in December 2006 (collectively, we refer to these three entities as "Harco").[1] *See* Amended Complaint ¶ 1-2, 6, 10-11, 34, 36 and

---

[1] Regarding the registration of Harco Manufacturing Group, LLC, we take judicial notice of the records of the Secretary of State. *See State ex rel. Everhart v. McIntosh*, 115 Ohio St.3d 195, 2007-Ohio-4798, 874 N.E.2d 516, ¶ 7-8; *State v. Persons*, 4th Dist. Meigs No. 16 CA 16, 2017-Ohio-7879, ¶ 2, fn.1; *In re Helfrich*, 5th Dist. Licking No. 13 CA 20, 2014-Ohio-1933, ¶ 35.

45. Appellant HMFG Group Limited Partnership was registered in January 2007. Amended Complaint ¶ 3. The most significant component of Harco's business, for purposes of the instant litigation, was the supply of vehicle parts to General Motors ("GM"). *See* Appellants' Brief 3-4.

{¶ 3} Harco's business had been struggling, with "decreasing employment and [sales] volumes" that it "attributed to GM['s] using foreign suppliers," which led Harco to seek "political intervention [from U.S. Senators Brown and Portman] to pressure GM to increase [the] volume" of its orders of parts from Harco. *See id.* at 4 and 22-23; Findings of Fact, Conclusions of Law and Entry of Verdict 2, Nov. 20, 2019 ("Judgment Entry"). In the latter half of 2014, Sunsong began discussions with representatives of Harco concerning a possible manufacturing partnership or acquisition. *See* Appellants' Brief 5-6; Appellees' Brief 3-4.

{¶ 4} On November 3, 2014, representatives of Sunsong visited Harco. Appellants' Brief 6; Appellees' Brief 4. Among other things, Harco presented a slideshow that listed a series of recently executed contracts, the "New Business," with GM. *See* Appellants' Brief 5-6 and 20-21; Appellees' Brief 4; Joint Exhibit I. Larry Harris and Richard Garver, Harco's general manager, acknowledged to Sunsong's representatives that Harco was struggling at the time, but Garver represented that the New Business would generate profits for Harco in subsequent years. Trial Transcript 113:1-116:7, 403:15-403:21, 459:18-460:10 and 544:9-546:13; Joint Exhibits I, VI-VII and XX; Defendants' Exhibit F; *see also* Appellants' Brief 7-9.

{¶ 5} Sunsong decided to pursue the acquisition of Harco, and on January 31,

2015, the parties executed a letter of intent. *See* Appellants' Brief 9; Appellees' Brief 6. Effective June 1, 2015, Sunsong and Appellants executed a contract entitled Membership Interest Purchase Agreement (the "MIPA"), by which Sunsong's acquisition of Harco was effected. *See* Appellants' Brief 2 and 14; Appellees' Brief 6. Thereafter, Sunsong named Jessie Wei as president of Harco. Trial Transcript 107:16-108:13.

{¶ 6} Harco continued to struggle following the acquisition, and Wei initiated an investigation. *See id.* at 111:10-113:19. Wei's investigation revealed that Harco's representatives had made material misrepresentations and concealed information about Harco's finances. *See id.* at 112:20-116:7. As a result, Sunsong asserted its right to indemnity under the MIPA and disclaimed any obligation to fulfill its remaining contractual obligations. *See* Appellants' Brief 2; Appellees' Brief 2.

{¶ 7} On October 28, 2016, Appellants filed a complaint against Sunsong, asserting claims for breach of contract, conversion, tortious interference with contractual relations, breach of fiduciary duty and fraudulent inducement. Sunsong filed an answer on December 1, 2016, with which it included counterclaims for breach of contract and fraud. Appellants filed an amended complaint on August 15, 2018, in which they withdrew their claims for conversion and fraudulent inducement; Sunsong filed an answer on August 20, 2018, reiterating its counterclaims.

{¶ 8} The case proceeded to a bench trial in December 2018. On November 20, 2019, the trial court entered judgment in favor of Sunsong. Appellants timely filed a notice of appeal on December 19, 2019.

## II. Analysis

{¶ 9} Appellants argue that the trial court entered judgment in favor of Sunsong

contrary to the evidence and the law. The "standard of review following a civil bench trial is whether the trial court's judgment [was] against the manifest weight of the evidence." *Downtime Rebuild, L.L.C. v. Trinity Logistics, Inc.*, 2019-Ohio-1869, 135 N.E.3d 1253, ¶ 12 (1st Dist.). An appellate court applying this standard "is guided by a presumption that the [trial court's] findings of [fact were] correct," but the trial court's application of the law is reviewed de novo. *Illum. Co. v. Bosemann*, 2020-Ohio-3663, 154 N.E.3d 1205, ¶ 32 (8th Dist.); *Huntington Natl. Bank, Successor v. Miller*, 10th Dist. Franklin No. 14AP-586, 2016-Ohio-5860, ¶ 13, citing *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 10} Where " 'the evidence is susceptible of more than one construction, the [appellate] court is bound to give it that interpretation which is consistent with the [the trial court's] judgment,' " or in other words, that interpretation which is " 'most favorable to sustaining the * * * judgment.' " *Seasons Coal Co.* at 80, fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978); *see also Emswiler v. Bodey*, 2d Dist. Champaign No. 2012-CA-3, 2012-Ohio-5533, ¶ 44. The appellate court should, furthermore, be "mindful that in a bench trial, 'the trial [court was] best able to view the witnesses,' " to observe the witnesses' " 'demeanor, gestures and voice inflections, and [to] use these observations in weighing the credibility of the proffered testimony.' " *Emswiler* at ¶ 44, quoting *Seasons Coal Co.* at 80. Accordingly, a judgment supported by competent, credible evidence should not be reversed on appeal. *Miller* at ¶ 13, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978); *see also State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, ¶ 81 (10th Dist.) (stating that an appellate court "may not substitute

its judgment for that of the trial court").

{¶ 11} For their first assignment of error, Appellants contend that:

THE TRIAL COURT ERRED BY IMPOSING FRAUD LIABILITY

FOR FORECASTS AND ESTIMATES[.]

{¶ 12} Appellants claim that Sunsong failed to produce any evidence of their making false representations of fact about the value of Harco. *See* Appellants' Brief 19-25. In the absence of such evidence, Appellants argue that the trial court erroneously predicated their liability for fraud on statements related to Harco's future performance, on the non-disclosure of information they had no obligation to disclose, and on alleged misrepresentations of fact made to third parties. *See id.*; *see also Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, paragraph seven of the syllabus.

{¶ 13} Fraud consists of: (1) a representation that is " 'material to [a given] transaction,' " is made " 'with the intent of misleading another [person] into relying on it,' " and is " 'made falsely, with knowledge of its falsity, or with such utter disregard and recklessness [for the truth] that knowledge [of the falsity of the representation] may be inferred' "; (2) the other person's " 'justifiable reliance' " on the representation; and (3) harm to the other person " 'proximately caused by the reliance.' " *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 47, quoting *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987). To support a cause of action for fraud, a representation must generally "involve a matter of fact that relates to the past or present," as opposed to "predictions or projections relating to future" events. *See Lucarell* at ¶ 63. Concealment of a material fact, "where there is a duty to disclose,"

is equivalent to a false representation. *See Groob* at ¶ 47.

{¶ 14} Here, the trial court concluded that Appellants sought to deceive Sunsong by "misrepresent[ing] Harco's financial status," particularly with respect to the New Business, which was "unprofitable and unsustainable." *See* Judgment Entry 2. First, the court found that Richard Garver, Harco's general manager, misled Sunsong when he stated that Harco's "business [would] grow by 37%" from 2015 to 2017, because Garver knew, without disclosing, that the volume of parts sold would increase without yielding any increase in profitability. *See id.* at 2-3; Trial Transcript 113:1-116:7, 403:15-403:21, 459:18-460:10 and 544:9-546:13; Joint Exhibits I, VI-VII and XX; Defendants' Exhibit F. Garver told Sunsong that Harco entered into the New Business contracts with GM at "target pricing," but he did not explain either that General Motors set the target prices or that Harco accepted the business despite the awareness of its management that it would lose money as a result. *See* Trial Transcript 362:10-363:18, 452:15-457:25 and 509:4-510:13. The court found that Garver thereby "intentionally created a false and misleading impression" regarding the value of the New Business, because Garver's definition of "target pricing" was contrary to "the meaning of the term in the GM-contracting field" and to the "plain and ordinary understanding of the [term]." Judgment Entry 4-5; Trial Transcript 362:10-363:18, 452:15-457:25 and 509:4-510:13; Joint Exhibit XXXVII.

{¶ 15} Second, the court found that on May 5, 2015, Harco did not update its sales forecast for 2015-2017, which it had already provided to Sunsong in November 2014 and again on April 28, 2015, despite having learned that "an unprofitable program [the "C1XX" program] was replacing a profitable program [the "Lambda" program] earlier than

expected."[2]   Judgment Entry 3; Joint Exhibits X-XI; Defendants' Exhibit J.   And third, in response to a due diligence request from Sunsong, in which Sunsong requested identification of any "potentially negative influences" on Harco's "future fiscal years' profit[ability]," Garver answered "none," which the court found was an "intentionally false" representation.   Judgment Entry 3-4; Trial Transcript 429:13-433:10; Joint Exhibits IV and XXIII.

{¶ 16} Appellants argue that the trial court erred by finding that these statements were misrepresentations of fact for purposes of a cause of action for fraud.   Appellants' Brief 19-21.   Characterizing the statements as "predictions, estimates, or opinions" about Harco's future performance, Appellants note the Ohio Supreme Court has held that an actionable " 'misrepresentation must involve a matter of fact that relates to the past or present.' "   *Id.* at 19, quoting *Lucarell* at ¶ 63.

{¶ 17} Although Appellants accurately quote *Lucarell*, they fail to account for the exception to the rule.   The " '<u>general rule</u> is that fraud cannot be predicated upon a representation concerning a future event" because "[m]ere predictions about the future, expectations, or opinions are not fraudulent misrepresentations <u>unless those opinions are fraudulently made</u>.' "   (Emphasis added.)   *Nilavar v. Osborn*, 127 Ohio App.3d 1, 21, 711 N.E.2d 726 (2d Dist.1998), quoting *Link v. Leadworks Corp.*, 79 Ohio App.3d 735, 742, 607 N.E.2d 1140 (8th Dist.1992); *see also Farris Disposal, Inc. v. Leipply's Gasthaus, Inc.*, 9th Dist. Summit No. 22569, 2005-Ohio-6737, ¶ 15. Likewise, a " 'promise

---

[2]   A "program" is the production of a series of parts for a group of similar vehicles.   For example, the "Lambda" program pertained to parts shared by the Buick Enclave, the Chevrolet Traverse and the GMC Acadia.   *See* Trial Transcript 355:21-356:22.

of future action, occurrence, or conduct' " can qualify as an actionable misrepresentation if the person who makes the promise " 'has no [concurrent] intention of keeping [it].' " *See Martin v. Ohio State Univ. Found.*, 139 Ohio App.3d 89, 98, 742 N.E.2d 1198 (10th Dist.2000), quoting *Tibbs v. Natl. Homes Constr. Corp.*, 52 Ohio App.2d 281, 287, 369 N.E. 1218 (1st Dist.1977); *see also Nilavar* at 22. In the latter circumstances, "the requisite [relation to] an existing fact is said to be found in the [contemporaneous] mental attitude and present intent" to deceive. *See Martin* at 98; *see also Nilavar* at 22; *Link* at 742.

{¶ 18} The *Martin* case involved the creation of a charitable remainder unitrust, established by two owners of real property in Columbus who had attempted unsuccessfully to sell the property to fund their retirement and relocation to Florida; the Ohio State University Foundation was designated to serve as trustee. *Martin* at 93-94. Acting on the advice of an attorney and an estate planner, the two owners abandoned their attempt to sell the property and, instead, transferred it into the trust, having been told repeatedly by their advisors that they would receive income from the trust immediately upon the completion of the transfer. *Id.* at 93-94 and 98-99. The advisors, however, knew at the time that the trust would produce no income until the trustee sold the property. *Id.* at 94. Three months after the transfer, the property owners were informed of the truth. *Id.*

{¶ 19} They then commenced an action against their advisors, the Ohio State University Foundation and several other defendants, asserting claims for fraud, negligent misrepresentation, breach of contract, and breach of fiduciary duty. *Id.* at 96. Following a trial, the trial court sustained the defendants' motion for a directed verdict on the claims

of fraud and negligent misrepresentation. *See id.* at 96-97.

{¶ 20} The property owners appealed the judgment to the Tenth District Court of Appeals. In support of the judgment, the defendants argued that their representations regarding the income from the trust were "only * * * projections," that they "did not make the representations with knowledge of [the representations'] falsity," and that the representations "were mere predictions [about] future events and were, thus, nonactionable expressions of opinion." *Id.* at 100. Rejecting the defendants' argument, the Tenth District found that the representations "were not 'mere predictions' of future events," given that the payment of income from the trust to the property owners "was not contingent [on the nature of an] unknown, hypothetical trust that had yet to be [created]," but rather, depended on "the specific [type of] trust" that the property owners' advisors had recommended. *Id.* Although the Tenth District "agree[d] that the dollar amounts, numbers, payout figures, and calculations [used by the advisors could] properly be termed as 'predictions,' [the court observed that] the starting date [on which the property owners would begin to receive payments] was not based upon an 'opinion' or an 'estimate.' " *Id.* at 101.

{¶ 21} Essentially, the Tenth District construed the representation about the starting date of payments as if it had been a promise to perform an act in the future, reasoning that it qualified as a misrepresentation of past or present fact in light of a contemporaneous intent to deceive, with the deceptive intent being made evident by the contradiction between the predicted starting date of payments and the form of the trust. *Id.* at 98 and 100-101. The import of this reasoning is that a prediction or statement of opinion regarding future events can be treated as a composite representation, comprising

a prognostic assertion about the future and an underlying assertion of fact about the past or present. *See Nilavar*, 127 Ohio App.3d at 21-22, 711 N.E.2d 726; *Crase v. Shasta Beverages, Inc.*, 10th Dist. Franklin No. 11AP-519, 2012-Ohio-326, ¶ 42; *Farris Disposal*, 9th Dist. Summit No. 22569, 2005-Ohio-6737, at ¶ 15; *Martin* at 100-101. Accordingly, where a representation about that which "is to be performed or * * * will take place in the future" is "untrue or [is] made with the intent to mislead," an action for fraud may be predicated on it, "notwithstanding the future nature of the representation." *Crase* at ¶ 42; *see Nilavar* at 21-22; *Martin* at 100.

{¶ 22} In *Lucarell*, the Ohio Supreme Court did not expressly mention the exception, but it nonetheless considered the exception as part of its deliberations. The plaintiff-appellant argued that Nationwide Mutual Insurance Company had misrepresented a program "to recruit new insurance agents [and assist them with] build[ing] profitable, self-sustaining agencies." *Lucarell*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, at ¶ 9. Specifically, the purported misrepresentation consisted of "a sample pro forma indicating that [the plaintiff-appellant] could earn an average of $200,000 in commissions and revenue per year," throughout a five-year period. *Id.* at ¶ 11 and 64. The Court held that a pro forma is " 'not * * * an actionable representation because it is a prediction about the future,' " as opposed to a statement " 'about the past or even the present,' " but the Court added that the record included "no evidence Nationwide knew [that agents in] its program * * * were failing" when the pro forma was presented to the plaintiff-appellant. *Id.* at ¶ 63 and 65, quoting *Bye v. Nationwide Mut. Ins. Co.*, 733 F.Supp.2d 805, 819 (E.D.Mich.2010). In other words, the Court found no evidence that Nationwide's prediction was fraudulently made. *See id.* at ¶ 11, 63 and

65; *see also Nilavar* at 21.

{¶ 23} The statement made by Richard Garver indicating that Harco expected its business to grow by 37 percent as a result of the New Business was a composite representation, which incorporated not only a prediction about the future, but also a misleading characterization of past and present fact related to the New Business. GM apparently awarded the New Business to Harco in 2013 and 2014. *See* Trial Transcript 819:15-820:23. Garver told Sunsong that Harco had taken the New Business at target pricing because General Motors otherwise would likely not have awarded it to Harco. *See id.* at 452:15-454:12. He did not, however, explain that the target prices for the parts included in the New Business had been set by GM, rather than Harco, nor did he explain that Harco would lose money on each of the parts it delivered at those prices. *Id.* at 362:10-363:18, 370:23-372:5, 401:14-403:21, 452:15-457:25, 509:4-510:13 and 518:18-520:5; Joint Exhibit XXXVII. Although "[i]n [his] mind, 'target' meant 'unprofitable,' " Garver never stated as much to Sunsong, nor did he clarify that the terms "growth" and "profitability" were not synonymous to him. Trial Transcript at 458:4-460:10, 509:4-510:13 and 544:9-546:13; Joint Exhibits I, VI-VII and XX; Defendants' Exhibit F.

{¶ 24} Furthermore, Garver knew, without disclosing, not only that the New Business had never been profitable for Harco, but also that over the "[l]ong term, [as much as Harco would have] like[d] [the New Business] to be profitable, [Harco would] have [had] to do some work to get it there." *See* Trial Transcript at 455:20-456:19 and 543:9-544:21. The "work" to which Garver referred included, among other things, the possibility of Harco's "mak[ing] improvements within [its] facility in terms of labor [and] efficiency, [as well as obtaining reductions in] purchase price[s] * * * from [its] suppliers." *See id.* at

543:22-544:8. Consequently, Garver's statement indicating that Harco expected its business to grow by 37 percent was a misstatement of past and present fact, not merely a prediction or an expression of his opinion.

{¶ 25} The evidence demonstrated, too, that on May 5, 2015, Harco sent Sunsong an out-of-date forecast of its sales for 2015-2017. Judgment Entry 3; Joint Exhibits X-XI; Defendants' Exhibit J. Harco had sent the same forecast to Sunsong in November 2014 and again on April 28, 2015, but before it sent the forecast for the third time on May 5, 2015, Harco had learned "that an unprofitable program [the "C1XX" program, part of the New Business] would be replacing a profitable program [the "Lambda" program] earlier than expected." Judgment Entry 3; *see* Trial Transcript 464:21-475:16 and 515:20-524:23; Joint Exhibit I. Although the sales forecasts in question were predictions, Harco incorporated a misrepresentation of present fact; its communication with Sunsong on May 5, 2015, effectively represented that the C1XX program would replace the Lambda program as originally scheduled, even though the schedule had been changed by GM. *See* Trial Transcript 474:8-475:16. Regardless of the possibility that the schedule might afterward have been revised again, Harco misrepresented a present fact by failing to provide Sunsong with the most recent information it had received from GM.

{¶ 26} Moreover, Sunsong requested in due diligence on January 29, 2015, that Harco disclose any "potentially negative influences" on its "future fiscal years' profit[ability]," and Garver answered "none," nominally indicating that he was aware of no such influences. Trial Transcript 429:13-432:12; Joint Exhibit IV and XXIII; Defendants' Exhibit G. Yet, by his own admission, Garver was aware that Harco was losing money on the New Business and that Harco would continue indefinitely to lose money unless it

could implement cost savings measures, notwithstanding that its ability to do so was speculative at the time. Trial Transcript at 362:10-363:18, 370:23-372:5, 401:14-403:21, 452:15-457:25, 509:4-510:13, 518:18-520:5 and 543:9-544:8. Garver thus misrepresented his knowledge of past and present facts pertaining to the value of the New Business.

{¶ 27} The trial court found further that appellants sought to deceive Sunsong by withholding certain information. Specifically, the court found that Harco withheld cost-of-goods-sold worksheets and updated GM production schedules, which would have "alerted Sunsong to the unfavorable financial posture of Harco" with respect to the New Business. *See* Judgment Entry 3. Appellants do not deny that they withheld these documents. Appellants' Brief 21-22. Instead, Appellants argue that the worksheets and production schedules were predictions, and they posit therefore that withholding the documents was not equivalent to an actionable misrepresentation. *Id.*

{¶ 28} The information presented in the withheld documents, however, was not merely predictive—it reflected the state of Harco's contracts with GM at the time. Had these documents been submitted to Sunsong, they would have revealed, or at least provided some indication, that Harco had accepted the New Business on unfavorable terms, or what Garver had euphemistically described as "target pricing." *See* Trial Transcript 114:5-116:7, 133:2-134:18, 471:20-475:16 and 509:4-510:13. By executing the MIPA, Harco obligated itself to disclose the occurrence of any event or any change in circumstances "that [could] reasonably [have] be[en] expected" to have a materially adverse effect on Harco's financial condition and business prospects. *See* Judgment Entry 5-6. Hence, the withholding of these documents, like Garver's failure to provide a

complete explanation of his statement indicating that the volume of Harco's sales would increase by 37 percent, was a misrepresentation of Harco's present knowledge about the terms on which it had accepted the New Business.

{¶ 29} Additionally, the trial court found that "[b]eginning in 2012 and [continuing] through 2014, Harco represented to [U.S. Senators Brown and Portman] that its contracts with GM were unprofitable, unsustainable, and likely to result in Harco['s] imminently ceasing [its] operations." Judgment Entry 2. Appellants argue that the court erred by finding that Harco's representations to the senators were " 'largely truthful and based in fact,' " and they claim that the representations were, instead, "hyperbole and opinion" that were "neither true nor false." Appellants' Brief 22, quoting Judgment Entry 2.

{¶ 30} Yet, in making this argument, Appellants point to no erroneous application of law or finding of fact unsupported by the record; rather, Appellants simply propose an alternative interpretation of the comments made on Harco's behalf to the two senators. Irrespective of whether the statements were entirely truthful or a mixture of objective accuracy and hyperbole, the trial court's interpretation of the statements was supported by the record, particularly by the content of the statements themselves. Contrary to Appellants' claim that the court construed the statements to be actionable as false representations, the court considered the statements only as evidence of Appellants' "intent to misrepresent" the value of Harco so that they could "justify [an] inflated pric[e]" for the acquisition of Harco and "assure the prompt closing of [their] deal" with Sunsong. *See* Judgment Entry 2; Trial Transcript 1428:25-1429:23.

{¶ 31} For all of the foregoing reasons, we hold that Appellants have not established that the trial court disregarded the manifest weight of the evidence or erred

as a matter of law in finding that they made actionable misrepresentations of fact to Sunsong.   Appellants' first assignment of error is overruled.

{¶ 32} For their second assignment of error, Appellants contend that:

THE TRIAL COURT ERRED BY FINDING QINGDAO/SUNSONG ACTUALLY AND JUSTIFIABLY RELIED ON ALLEGEDLY FALSE STATEMENTS OR CONCEALMENT.

{¶ 33} Here, Appellants challenge the trial court's determination that Sunsong justifiably relied upon their "[allegedly] false representations."   Appellants' Brief 25; Judgment Entry 8.   Specifically, Appellants argue that Sunsong could not have relied on the representations cited by the court because: (1) Sunsong "initiated and approved the * * * acquisition" of Harco before engaging in due diligence; (2) Harco "disclaimed [any] obligations or liability for conduct preceding" the execution of the letter of intent on January 31, 2015; (3) Harco's disclosures during due diligence were sufficient to disabuse Sunsong of "its inferences that all [of] the New Business * * * was profitable"; and (4) Sunsong "confirm[ed] that [it] did not rely on [Harco's representations regarding the profitability of the] New Business" contracts, inasmuch as "those contracts were not [the reason it sought to purchase] Harco."   Appellants' Brief 25-27.

{¶ 34} A party asserting a cause of action for fraud must prove that it justifiably relied on false representations.   *Groob*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, at ¶ 47.   Whether the aggrieved party's reliance was justified " 'is [a question] of fact and requires an inquiry into the relationship' " between the party who allegedly made the false representations and the aggrieved party.   *Buckeye Retirement Co., LLC, Ltd. v. Busch*, 2017-Ohio-4009, 82 N.E.3d 66, ¶ 47 (2d Dist.), quoting *Crown*

*Property Dev., Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 657, 681 N.E.2d 1343 (12th Dist.1996). Reliance " 'is justifiable if [a] representation does not appear unreasonable on its face and if there is no apparent reason to doubt the veracity of the representation under the circumstances,' " although " 'reliance and responsibility must be balanced.' " *Id.*, quoting *Lapos Constr. Co. v. Leslie*, 9th Dist. Lorain No. 06 CA 008872, 2006-Ohio-5812, ¶ 21. Parties to " 'ordinary business transactions are expected to exercise reasonable prudence and not to rely upon others with whom they deal to care for and protect their interests,' " yet " 'this requirement is not to be carried so far that the law [thereby] ignore[s] or protect[s] positive, intentional fraud * * * practiced upon the simple-minded or unwary.' " *Amerifirst Savs. Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 495-496, 737 N.E.2d 68 (2d Dist.1999), quoting 50 Ohio Jurisprudence 3d, Fraud and Deceit, Section 132 (1984). Justification " 'is a matter of the qualities and characteristics of [a] particular plaintiff, and the circumstances of [a] particular case, rather than [a matter] of the application of a community standard of conduct to all cases.' " *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), quoting 3 Restatement of the Law 2d, Torts, Section 545A, Comment b (1977); *see also Krug* at 496.

{¶ 35} The trial court found that "Sunsong justifiably relied on [Harco]'s misrepresentations." Judgment Entry 8. Appellants argue, first, that Sunsong could not have relied on the statements cited by the court because Sunsong "initiated and approved" its acquisition of Harco before engaging in due diligence. Appellants' Brief 26. According to Appellants, Sunsong indicated that it had decided to proceed in an email message sent by one of its employees on November 10, 2014; the message stated that "it [was] game time," because Sunsong's "board [had] approved the purchase." *Id.*;

Joint Exhibit XXI. On November 20, 2014, Richard Garver sent Sunsong "documents addressing [Harco's] 2014 balance sheet, 2015-2017 volumes and sales dollars per vehicle platform, and the Harco organization chart," and Sunsong began its due diligence in earnest on or about January 29, 2015. *See* Joint Exhibits IV and VII.

{¶ 36} The trial court did "not believe that [Sunsong's] board * * * approved the transaction * * * before the due diligence was completed," interpreting the email message of November 10, 2014, to mean that Sunsong's board had authorized Jessie Wei "to proceed with due diligence [but had reserved for] the very end [the decision] whether or not they were [actually] going to acquire Harco." *See* Trial Transcript 1430:8-1430:14. Thus, Appellants' argument that Sunsong had effectively given Wei "carte blanche to close the transaction [months] in advance of due diligence, * * * regardless of what due diligence might have revealed[,] [was] not credible" to the court. *Id.* at 1430:15-1430:19. Wei, for her part, testified that the premise of Appellants' argument was "just not possible." *Id.* at 260:1-261:10.

{¶ 37} Implicitly, the trial court found Wei's testimony to be credible; the court cited Wei's testimony in support of its findings of fact more than the testimony of any other witness. *See* Judgment Entry 2-4. We likewise find Appellants' argument to be implausible, and we defer to the court's assessment of the credibility of Wei's testimony.

{¶ 38} Appellants argue, second, that the letter of intent executed on January 31, 2015, relieved them of any "obligations or liability for conduct preceding" the execution of the letter. *See* Appellants' Brief 26. The letter stated, in relevant part, that except as provided elsewhere in the letter itself or "in any binding written agreement that the parties [might] enter into" subsequent to the date of the letter, "no past or future action, course of

conduct, or failure to act relating to [Sunsong's] [a]cquisition [of Harco], or relating to the negotiation of the terms of the [a]cquisition or any [final purchase agreement], will give rise to or serve as a basis for any obligation or other liability on the part of the parties or any of the * * * [c]ompanies" acquired by Sunsong. *See* Joint Exhibit II. Under § 5.1 and 5.4 of the MIPA, however, Harco obligated itself to cooperate fully with Sunsong's due diligence efforts and to correct any inaccurate representations made before the agreement's "[c]losing [d]ate," which was June 1, 2015. *See* Defendants' Exhibit B. Even if the letter of intent relieved Appellants of any liability for misrepresentations made before January 31, 2015, the provisions of the MIPA superseded any contrary provisions of the letter of intent. *Id.* (stating in Section 12.7 that the MIPA "supersedes all prior agreements," including "the amended and restated [l]etter of [i]ntent * * * dated * * * January 31, 2015").

{¶ 39} Appellants argue, third, that their disclosures during due diligence were sufficient to disabuse Sunsong of "its inferences that all [of] the New Business * * * was profitable." Appellants' Brief 26-27. By Appellants' reckoning, Sunsong could not reasonably have "rel[ied] on [their] predictions of [Harco's] financial performance because [predictions] 'are speculative and subject to changing economic conditions.' " Appellants' Brief 26, quoting *Lucarell*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, at ¶ 64.

{¶ 40} The trial court found in this respect that Appellants "made certain partial or selective disclosures [and] then failed * * * fully and accurately [to] disclose all relevant facts necessary to dispel the resultant misleading impressions." Judgment Entry 7. In light of our holding that the representations characterized by Appellants as mere

predictions were actionable misrepresentations of fact, we conclude that Appellants' argument lacks merit. The record, furthermore, includes competent, credible evidence that supports the trial court's determination.

{¶ 41} Appellants argue, fourth, that Sunsong essentially admitted that it did not rely on their representations about the profitability of the New Business. Appellants' Brief 27. The record, on the other hand, includes essentially no evidence that Sunsong made such an admission, and Appellants rely largely on an exhibit that the trial court excluded from evidence. Jessie Wei, moreover, testified that Sunsong did rely on Appellants' representations about the New Business, and the trial court deemed Wei's testimony to be credible. Trial Transcript 109:25-112:16. Based on our review of the record, we find no reason to second-guess the trial court's assessment of Wei's credibility, and the evidence otherwise supported the trial court's judgment. Appellants' second assignment of error is overruled.

{¶ 42} For their third assignment of error, Appellants contend that:

THE TRIAL COURT ERRED BY FINDING THAT THE HARRIS FAMILY BREACHED SECTIONS 3.5, 3.12, 5.1, 5.2, AND 5.4 OF THE MEMBERSHIP INTEREST PURCHASE AGREEMENT ("MIPA").

{¶ 43} Appellants fault the trial court for finding that they breached the MIPA without presenting any exegesis on the provisions cited by the court in its judgment. See Appellants' Brief 27. As well, Appellants argue that the court should have construed ambiguous terms of the MIPA against Sunsong; that the court ignored the MIPA's definitions of certain terms; that Sunsong did not prove that it submitted any "reasonable request for information to which Harco provided no response"; and that Richard Garver,

by answering "none" in response to Sunsong's request for disclosure of any "potentially negative influences" on its "future fiscal years' profit[ability]," did not make a misrepresentation on Harco's behalf in breach of the MIPA. *Id.* at 28-29; *see also* Trial Transcript 429:13-432:12; Joint Exhibit IV and XXIII; Defendants' Exhibit G.

{¶ 44} Article 3 of the MIPA concerns Harco's "[r]epresentations and [w]arranties." Defendants' Exhibit B. Under Section 3.5(a), Harco represented that its "books of account and other [r]ecords" were "complete and correct in all material respects, [and that they] [reflected] actual, bona fide transactions." *Id.* Under Section 3.12, Harco represented that "since [December 31, 2014], [Harco had not] suffered any Material Adverse Change" and that to Harco's knowledge, "no circumstance [then] exist[ed]" that could "reasonably [have been] expected to result in a Material Adverse Change." *Id.*

{¶ 45} The term "Material Adverse Change" is defined by Section 1.1 as "any event, * * *, development, or occurrence that, individually or together with any other event, * * *, development, or occurrence, [was] materially adverse to [Harco's] business, condition (financial or otherwise), assets, results of operations, or prospects." *Id.* We have, however, affirmed the trial court's finding that Harco concealed certain material information from Sunsong, and made false representations of fact pertinent to Harco's financial prospects. Consequently, we concur with the trial court's determination that Harco breached Sections 3.5 and 3.12.

{¶ 46} Article 5 of the MIPA sets forth Harco's "[c]ovenants * * * [p]rior to [the] Closing Date"; the "Closing Date" was June 1, 2015. *See id.* Under Section 5.1, Harco agreed that it would "cooperate and assist, to the extent reasonably requested by [Sunsong], with [Sunsong]'s investigation of [Harco], [and Harco's] condition (financial or

otherwise), assets, results of operations, or prospects." *Id.* Under Section 5.2(d), Harco agreed that it would "report to [Sunsong] at such times as [Sunsong might] request concerning the status of [Harco's] business, [and its] condition (financial or otherwise), assets, results of operations, or prospects." *Id.* Under Section 5.4(a), Harco agreed that, "[p]rior to the Closing Date," it would "promptly provide notice to [Sunsong] of any Breach of any representation or warranty [on Harco's part] or any fact or circumstance that would[,] or would * * * be [reasonably] likely to[,] cause or constitute a Breach of any such representation or warranty," assuming that the "representation or warranty [had] been made as of the time of the occurrence of such fact or circumstance." *Id.*

{¶ 47} The term "Breach" is defined, in relevant part, by Section 1.1 as "any inaccuracy" in "any representation." *Id.* Again, we concur with the trial court's determination that Harco breached Sections 5.1, 5.2 and 5.4 by concealing material information and by making false representations of fact. Appellants' third assignment of error is overruled.

{¶ 48} For their fourth assignment of error, Appellants contend that:

THE TRIAL COURT ERRED BY IMPOSING DAMAGES CONTRADICTING QINGDAO/SUNSONG'S ADMISSIONS AND AWARDING A WINDFALL.

{¶ 49} Here, Appellants list four reasons that the trial court should not have relied on the testimony of Jeffrey Long, an expert witness who testified on Sunsong's behalf regarding damages. *See* Appellants' Brief 29-34. First, Appellants argue that Long's testimony was unsound because he "did not use any of the accepted valuation methods." *Id.* at 31.

{¶ 50} Long became a certified public accountant in 1983. Trial Transcript 844:3-844:5. In May 2007, he was certified as a fraud examiner, and in October 2008, he was certified in financial forensics. *Id.* at 844:6-844:11. He testified that for purposes of determining Sunsong's damages, he generally relied on technical practice aids published by the American Institute of Certified Public Accountants, noting that a practice aid entitled "Mergers and Acquisitions Disputes" was "particularly relevant" to his work in this case. *Id.* at 844:20-845:7. Although Appellants claim that Long did not use any accepted methodology, their own expert accountant, Michael Stover, did not contest the validity of the practice aids or testify that Long did not use any accepted methodology; instead, Stover testified that, in his opinion, Long's calculation of Sunsong's damages was predicated on the inaccurate assumption that Sunsong was a "[f]inancial buyer * * * mostly concerned with [Harco's] earnings," rather than a "strategic buyer" interested in acquiring assets other than an income stream, such as Harco's "relationship with General Motors," the experience of Harco's employees, the "technology" developed by Harco, and Harco's "excess manufacturing capacity." *See id.* at 1187:16-1189:4, 1194:11-1194:24, 1196:3-1196:21, 1203:18-1204:9, 1210:9-1211:5, 1216:12-1217:7 and 1218:14-1220:19.

{¶ 51} Appellants argue, second, that "because [Sunsong] purchased Harco * * * as a 'going concern,' " the trial court "fundamentally erred" in relying on Long's testimony because the resulting award of damages "deprived [Appellants] of the goodwill that is part of [the] value" of a going concern. Appellants' Brief 32. In support of this argument, Appellants quote a definition of the term "going concern" but fail to present a definition of the term "goodwill," and they cite a single, non-binding opinion in which the Delaware Court of Chancery found, on the specific facts of the case before it, that an expert

witness's "failure to include an amount for goodwill" as part of the valuation of a business "was inappropriate." *In re Radiology Assocs., Inc. Litigation*, 611 A.2d 485, 496, 17 Del. J. Corp. L. 1257 (Del.Ch.1991).

{¶ 52} Long testified that "in this situation, [Sunsong was] buying a bundle of assets," like Harco's relationship with GM and Harco's predicted "profitability once [the] [N]ew [B]usiness * * * reached full production status * * * in 2016." *See* Trial Transcript 872:20-873:1. Sunsong expected its acquisition of the bundle of assets to "throw off synergies," which Long defined as "those aspects [of the] deal that [were] relevant to [Sunsong as] a strategic buyer," such as Harco's status as "a direct supplier" to GM. *See id.* at 872:20-873:2 and 964:20-965:14. Long explained that the purchase price paid by Sunsong "include[d] a premium" for the bundle, "and particularly [for] the synergies." *Id.* at 873:20-874:2 and 964:20-965:14.

{¶ 53} Continuing, Long testified that a "premium" generally encompasses the value of the synergies to be derived from the purchase of a business; he added that where synergies "are separately identifiable, the acquisition method of accounting would require that they be identified[,] valued and recorded as part of the acquisition," before "all the identifiable stuff" is subtracted from the purchase price, with the "differen[ce] [being] goodwill." *See id.* at 886:4-886:25. Stover, in his testimony for Appellants, characterized "goodwill" as a "kind of * * * catch-all," or that which is "left over" after the assessment of a business's easily valued assets, such as cash, equipment and inventory, along with some of the business's less easily valued assets, such as its "customer relationship[s] [and] trade name." *See id.* at 1211:16-1212:25. Goodwill, he said, is "everything else," meaning that it is "[a]ll of the other intangible reasons to make

a purchase." *Id.* at 1212:21-1212:25.

{¶ 54} According to Long and Stover alike, the value of an acquired business's goodwill is—put simply—the difference between the price paid by the purchaser and the quantifiable value of the business. *See id.* at 886:4-886:25, 1074:13-1075:2 and 1211:16-1212:25; *see also, e.g., Tri Cty. Wholesale Distribs., Inc. v. Labatt USA Operating Co., LLC*, 112 F.Supp.3d 639, 649 (S.D.Ohio 2015), *rev'd in part on other grounds*, 828 F.3d 421 (6th Cir.2016); *People ex rel. Dept. of Transp. v. Presidio Performing Arts Found.*, 5 Cal.App.5th 190, 201, 209 Cal.Rptr.3d 461 (Cal.App.2016); *Systems & Computer Tech. Corp. v. Commonwealth*, 41 A.3d 961, 962, fn.4 (Pa.2012); *Kaplan v. Goldsamt*, 380 A.2d 556, 558-559 (Del.Ch.1977). Long indicated that his "assignment * * * was to determine whether or not the * * * purchase price [paid by Sunsong] was higher than it ought to have been because of [Appellants'] conceal[ment] [and] misrepresent[ation] [of] information" about Harco's actual value. *See* Trial Transcript 851:12-851:25. Given that the purchase price represented the total value of the "bundle of assets" that Sunsong acquired, Long's determination that the purchase price was inflated by the concealment and misrepresentation of information was equivalent to a determination that the value of Harco was likewise overstated. *See* Trial Transcript 872:20-873:1, 873:20-874:2 and 964:20-965:14. By awarding damages to Sunsong based on the amount by which the purchase price of Harco was artificially inflated, then, the trial court did not deny Appellants compensation for goodwill.

{¶ 55} Third, Appellants argue that Sunsong "sustained no damages," and they fault the trial court, again, for relying on Long's testimony. Appellants' Brief 33. Yet, as our foregoing analysis indicates, we find no basis on the record to conclude, as Appellants

insist, that Long's testimony "was not reliable."[3]   *Id.*; *see also* Appellees' Brief 31-33.

**{¶ 56}** Fourth, Appellants argue that if we reverse the trial court's judgment as it relates to Sunsong's claim for fraud but affirm the court's judgment as it relates to Sunsong's claim for breach of contract, then the cap on indemnity damages set forth in the MIPA should be applied, and we should remand the case with instructions for the entry of a revised judgment.   In light of our resolution of Appellants' first and second assignments of error, this argument is moot.   Appellants' fourth assignment of error is overruled.

**{¶ 57}** For their fifth assignment of error, Appellants contend that:

THE TRIAL COURT ERRED BY AWARDING ATTORNEY'S FEES

AND PREJUDGMENT INTEREST[.]

**{¶ 58}** Finally, Appellants argue that because the trial court's judgment that Harco was liable for "fraud and breach of contract * * * should be reversed," the court's award to Sunsong of attorney's fees and prejudgment interest "also should be reversed." Appellants' Brief 34.   They add that irrespective of whether their first, second, third and fourth assignments of error are sustained, the award of prejudgment interest should be reversed because Sunsong's "efforts to settle were the opposite of reasonable," and "the Harris Family rightfully viewed [settlement] offers requiring payment over time with extreme skepticism."   *Id.* at 35.

**{¶ 59}** Pursuant to R.C. 1343.03(C), a court may award prejudgment interest "upon

---

[3] Appellants observe that the trial court "obviously struggled to follow * * * Long's testimony."   Appellants' Brief 33.   Although the court did, at several points, ask Long to clarify his testimony, we agree with Sunsong that Appellants' observation "is insulting" as it was expressed.   Appellees' Brief 33.

motion of any party to a civil action that is based on tortious conduct," in which "the court has rendered a judgment," if the court "determines at a [subsequent] hearing * * * that the [losing] party * * * failed to make a good faith effort to settle the case."   A party "has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if [the party] (1) fully cooperated in discovery proceedings, (2) rationally evaluated [its] risks and potential liability, (3) [did not engage in conduct intended] to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party."   *Kalain v. Smith*, 25 Ohio St.3d 157, 159, 495 N.E.2d 572 (1986).

**{¶ 60}** The trial court found that Appellants and Sunsong "concede[d] that the first and second *Kalain* factors were satisfied," and that Appellants "failed to make a good faith [offer of a] monetary settlement," whereas "Sunsong aggressively engaged in good faith efforts to settle."   Amended Judgment Entry 5-6, June 8, 2020.   Appellants offer no citations to the record indicating that the trial court's findings were contrary to the weight of the evidence, and we hold as a result that the court did not err by awarding prejudgment interest to Sunsong.   Furthermore, our resolution of Appellants' other assignments of error renders their argument regarding attorney's fees moot.   Appellants' fifth assignment of error is overruled.

### III. Conclusion

**{¶ 61}** We hold that trial court's judgment is supported by competent, credible evidence and that the trial court did not err in its application of the law.   The trial court's judgment of November 20, 2019, is therefore affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Richard A. Talda
Daniel J. Gentry
D. Jeffrey Ireland
Jason W. Palmer
Melissa L. Watt
Hon. Mary Lynn Wiseman